(Nos. 80460, 80535 cons.—

## *In re* CHICAGO FLOOD LITIGATION.

*Opinion filed February 20, 1997.—Rehearing denied June 2, 1997.*

McMORROW, J., concurring in part and dissenting in part.

Cassiday, Schade & Gloor, of Chicago (John D. Cassiday, Martha A. Pagliari, Jennifer A. Keller and Carolyn Quinn, of counsel), for appellant ITT Hartford.

William J. Harte, Ltd., Barnow & Goldberg, P.C. and Holstein, Mack & Klein (William J. Harte, Ben Barnow, Alan M. Goldberg, Albert Cueller III, Bruce J. Goodhart, Aron D. Robinson and Gina R. Fietsam, of

counsel), all of Chicago, for appellant class action plaintiffs.

Susan S. Sher, Corporation Counsel (Lawrence Rosenthal, Benna Ruth Solomon and Timothy W. Joranko, of counsel), and Jenner & Block (Theodore R. Tetzlaff, Thomas W. Mulroy and Richard C. Bollow, of counsel), all of Chicago, for appellee City of Chicago.

JUSTICE FREEMAN delivered the opinion of the court:

In April 1992, the underground freight tunnel system in the central business district of Chicago flooded. Numerous named plaintiffs (class plaintiffs) represent individuals and businesses that claim property damage and economic loss as a result. ITT Hartford (Hartford), the subrogee of several additional claimants, opted out of the certified class. Class plaintiffs and Hartford each brought an action in the circuit court of Cook County against defendants, the City of Chicago (City) and the Great Lakes Dredge and Dock Company (Great Lakes). Class plaintiffs and Hartford sought damages for their various alleged injuries.

The trial court granted in part and denied in part the City's and Great Lakes' motions to dismiss. 735 ILCS 5/2—615, 2—619 (West 1994). The court also certified several questions for interlocutory appeal (155 Ill. 2d R. 308), and found that there was no just cause to delay appeal of several additional issues (155 Ill. 2d R. 304(a)).

In an unpublished order (Nos. 1—93—0207, 1—93—0209, 1—93—0318, 1—93—1570, 1—93—1602, 1—93—1848, 1—93—1902, 1—94—387, 1—94—388 cons. (unpublished order under Supreme Court Rule 23)), the appellate court upheld all but two of the trial court's rulings. We allowed class plaintiffs' and Hartford's separate petitions for leave to appeal (155 Ill. 2d R. 315) and consolidated the causes for review; the City cross-appeals

(155 Ill. 2d R. 318(a)). We now affirm the appellate court in part and reverse in part.

## BACKGROUND

A motion to dismiss under either section 2—615 or section 2—619 of the Code of Civil Procedure (735 ILCS 5/2—615, 2—619 (West 1994)) admits all well-pled allegations in the complaint and reasonable inferences to be drawn from the facts. *Anderson v. Anchor Organization for Health Maintenance*, 274 Ill. App. 3d 1001, 1012 (1995); *Pechan v. DynaPro, Inc.*, 251 Ill. App. 3d 1072, 1083-84 (1993); *Davis v. Weiskopf*, 108 Ill. App. 3d 505, 509 (1982). The complaints allege as follows. An old, underground freight tunnel system (tunnel) is located under the central business district of Chicago, commonly known as the Loop, and the Chicago River. Many buildings in the Loop are connected directly or indirectly to the tunnel. Before 1959, the tunnel was used to transport freight in the Loop. Since 1959, the City has owned the tunnel and, since the 1970s, has leased the tunnel to a number of utility and telecommunication companies to carry their service lines. The tunnel crosses under the Chicago River at different locations, including near the Kinzie Street bridge.

In May 1991, the City entered into a contract with Great Lakes, which provided that Great Lakes would remove and replace wood piling clusters at five Chicago River bridges, including the Kinzie Street bridge. The contract warned Great Lakes not to drive the pilings "at any other location than that specified by the City *** [because] even slight position changes may cause serious damage to various underground *** structures." The contract further provided that if Great Lakes failed to heed this warning, Great Lakes would be liable to repair such damages at its own expense.

By September 1991, Great Lakes informed the City that it had fully completed the work. However, Great

Lakes had installed the pilings at the Kinzie Street bridge in a location other than originally designated in the contract. During pile driving at the bridge, Great Lakes caused a breach in the tunnel wall by physically breaking, weakening, or creating excessive pressure on the tunnel wall.

In January 1992, a television crew using the tunnel discovered the breach in the tunnel wall at the Kinzie Street bridge. By February 1992, the television crew notified the City of the tunnel damage. During March and early April 1992, City employees inspected the tunnel, photographed the damage, and recommended immediate repairs.

On or about April 13, 1992, the tunnel breach opened. In a sudden torrent and continuing flow, the Chicago River rushed into the tunnel and, ultimately, into buildings connected to the tunnel. Approximately 200,000 persons were evacuated from numerous Loop buildings. On April 14, the Governor of the State of Illinois declared the Loop and surrounding areas a state disaster area. The next day, the President of the United States declared the area a federal disaster area. Thousands of Loop building occupants were unable to return to their respective places of business for days or weeks thereafter while emergency repairs and cleaning took place. Class plaintiffs and Hartford sought damages for various alleged losses proximately caused by the flood, including: injury to their property; lost revenues, sales, profits, and good will; lost wages, tips, and commissions; lost inventory; and expenses incurred in obtaining alternate lodging.

### Class Plaintiffs' Complaint

Class plaintiffs' complaint contains 10 counts, five of which are directed against the City. Class plaintiffs alleged that the City failed to: (1) properly contract for, administer, and supervise Great Lakes' pile driving

activities; (2) exercise ordinary care to maintain, repair, and protect the tunnel both before and after the breach (but only up to the time of the actual flood); and (3) warn class plaintiffs of the dangerous condition caused by the tunnel breach when the City learned of it. Class plaintiffs allege that these acts constitute willful and wanton misconduct (count III) and negligence (count IV). Class plaintiffs also alleged that the City and Great Lakes were engaged in abnormally dangerous (count VII) and ultrahazardous (count VIII) activities—pile driving and maintaining the tunnel—and were strictly liable for any resulting damages. Class plaintiffs also alleged that they were the third-party beneficiaries of the contract between the City and Great Lakes, which both parties breached (count V). Class plaintiffs subsequently voluntarily dismissed this count.

The trial court granted the City's motion to dismiss the strict tort liability counts. The court also ruled that the *Moorman* doctrine (see *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982)) barred from recovery those plaintiffs who did not allege physical property damage, but rather only economic loss. The court also ruled that the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1—101 *et seq.* (West 1994)) immunized much of the City's alleged negligence. As part of class plaintiffs' appeal, the trial court certified the following questions for review (155 Ill. 2d R. 308): (1) whether the City's proprietary use of the tunnel precludes immunity under the Tort Immunity Act; (2) whether the Tort Immunity Act immunizes any of the City's alleged failures to adequately contract for, supervise, or monitor the river piling work; and (3) whether the *Moorman* doctrine bars the claims of those plaintiffs who allege only economic loss. The court also allowed class plaintiffs to appeal (155 Ill. 2d R. 304(a))

from the dismissal of the abnormally dangerous and ultrahazardous counts.

The trial court denied the City's motion to dismiss as to the failure-to-repair and the failure-to-warn theories in the negligence count, and the willful and wanton misconduct count. The court denied the motion also as to those plaintiffs seeking recovery for perishable inventory lost as a result of interrupted utility service and for unspecified property damage. As part of the City's appeal, the trial court certified the following questions for review: (1) whether the City is not liable to class plaintiffs as a matter of law for its failure to promptly repair the tunnel or to warn class plaintiffs of the tunnel damage, because either the Tort Immunity Act immunizes the City, or the City did not owe class plaintiffs a duty to perform those acts; (2) whether there is a willful and wanton exception to the discretionary act immunity granted to the City by the Tort Immunity Act; and (3) whether the *Moorman* doctrine bars the claims of those plaintiffs who seek tort recovery for loss of perishable inventory and unspecified property damage.

### Hartford's Complaint

Hartford is the subrogee of several additional individuals and businesses that it insures. Hartford opted out of the certified class and filed a complaint, which it subsequently amended, against the City and Great Lakes. Hartford's complaint included a strict tort liability claim based on an ultrahazardous activity theory and a nuisance claim.

The trial court granted the City's and Great Lakes' motion to dismiss these claims. The court again ruled that pile driving is not an ultrahazardous activity. The court also dismissed the nuisance claim as to Hartford's subrogors who did not incur any: (1) invasion of their property by the flood waters; and (2) property damage, but rather only an economic loss (*Moorman*). The court

allowed Hartford to appeal immediately from the dismissal of these counts (155 Ill. 2d R. 304(a)).

We note that a federal court, in an admiralty proceeding, has stayed all flood-related litigation as to Great Lakes. Claims against Great Lakes fall within federal admiralty jurisdiction and must be pursued in federal court under the Limitation of Vessel Owner's Liability Act (46 U.S.C. § 181 *et seq.* (1982)). See *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 130 L. Ed. 2d 1024, 115 S. Ct. 1043 (1995).

### Appellate Court

The appellate court consolidated all of the certified questions and interlocutory appeals and disposed of them in an unpublished order (134 Ill. 2d R. 23). Regarding the Tort Immunity Act, the appellate court upheld the following rulings of the trial court. The Tort Immunity Act applied to class plaintiffs' and Hartford's claims regardless of whether the City's acts were "proprietary" or "governmental." Section 3—108 of the Act immunized the City for failure to supervise or monitor Great Lakes' work. Also, section 2—201 of the Act immunized the City for its decision to replace the pilings, but did not, as a matter of law, immunize the City for a failure to repair or warn. Reversing the trial court, the appellate court held that section 2—201 immunizes the City for willful and wanton misconduct.

The appellate court upheld the trial court's rulings that the *Moorman* doctrine barred the claims of those plaintiffs who alleged only an economic loss, but did not bar the claims of those plaintiffs who suffered damage in the form of inventory lost due to interrupted utility service. Regarding Hartford's nuisance claim, the appellate court upheld the trial court's denial of recovery for those plaintiffs who did not suffer a physical invasion of their property by the flood waters. However, reversing the trial court, the appellate court held that the *Moor-*

*man* doctrine did not bar an otherwise proper nuisance claim. The appellate court also upheld the dismissal of class plaintiffs' and Hartford's abnormally dangerous or ultrahazardous activities claims. Class plaintiffs, Hartford, and the City all appeal.

## DISCUSSION

When ruling on a motion to dismiss, either for failure to state a cause of action (735 ILCS 5/2—615 (West 1994)) or because the claims are barred by other affirmative matter that avoids the legal effect of or defeats the claim (735 ILCS 5/2—619(a)(9) (West 1994)), the trial court must interpret all pleadings and supporting documents in the light most favorable to the nonmoving party. The court should grant the motion only if the plaintiff can prove no set of facts that would support a cause of action. On appeal, review is *de novo*. See *Pechan*, 251 Ill. App. 3d at 1083; *Toombs v. City of Champaign*, 245 Ill. App. 3d 580, 583 (1993). In the present case, the parties' contentions fall under four main headings: (1) Tort Immunity Act, (2) *Moorman* Doctrine, (3) Nuisance, and (4) Abnormally Dangerous or Ultrahazardous Activity.

### Tort Immunity Act

Class plaintiffs contend that the appellate court erred in holding that: (1) the City's proprietary use of the tunnel does not preclude immunity under the Tort Immunity Act; (2) the Act immunizes the City from liability for its alleged failure to supervise and monitor the river piling work performed by Great Lakes; and (3) there is no willful and wanton exception to the discretionary immunity granted to the City by the Act. On cross-appeal, the City contends that the appellate court erred in holding that the Act does not immunize the City from liability for allegedly failing to promptly repair the tunnel or warn class plaintiffs of the tunnel damage.

### Governmental/Proprietary Function

Class plaintiffs allege that the City was engaged in a proprietary function, as opposed to a governmental function, by leasing the tunnel to utility and telecommunication companies. Thus, according to class plaintiffs, the Tort Immunity Act does not apply to this case, and the City is not immune from liability as a matter of law.

The trial court rejected this contention, reasoning that the Act did away with the governmental/ proprietary function distinction. The appellate court affirmed, relying on its decision in *Corral v. Chicago Park District*, 277 Ill. App. 3d 357 (1995). We agree with the trial and appellate courts.

Under the doctrine of sovereign or governmental immunity, a governmental unit is immune from tort liability. The doctrine originates in the common law principle that "the King can do no wrong," and the more logical and practical principle that there can be no legal right against the authority that makes the law on which the right depends. *Burdinie v. Village of Glendale Heights*, 139 Ill. 2d 501, 506 (1990) (and authorities cited therein). The doctrine of sovereign immunity runs counter to the basic concept of tort law that liability follows negligence. *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11, 20 (1959); accord 18 McQuillen on Municipal Corporations § 53.02.10, at 131-32 (3d rev. ed. 1993); C. Rhyne, The Law of Local Government Operations § 32.2, at 1042 (1980).

To mitigate the harshness and injustice of the sovereign immunity doctrine, courts and state legislatures developed exceptions to the rule. A major exception that was engrafted onto the common law doctrine of sovereign immunity was the governmental/ proprietary function distinction. 18 McQuillen on Municipal Corporations § 53.02.10, at 132 (3d rev. ed. 1993); C. Rhyne, The Law of Local Government Operations § 32.2, at 1042 (1980).

Under this exception to governmental immunity, when a municipality performs a governmental function, the municipality is acting as the arm or agent of the state and, thus, is immune from liability for the torts committed by its officers and employees. When the municipality performs a proprietary or corporate function, the municipality is liable for the tortious conduct of its officers and employees. Whether a governmental function exists is determined from the nature of the duty to be discharged or the act to be done. If the duty or act involves the general public's benefit, rather than a corporate or business undertaking for the municipality's corporate benefit, then the function is governmental whether the duty be directly imposed on the municipality or is voluntarily assumed. *Merrill v. City of Wheaton*, 379 Ill. 504, 507-08 (1942); *Gebhardt v. Village of La-Grange Park*, 354 Ill. 234, 236, 238 (1933); accord 18 McQuillen on Municipal Corporations §§ 53.23, 53.29 *et seq.* (3d rev. ed. 1993); C. Rhyne, The Law of Local Government Operations § 32.2, at 1042 (1980).

This court conceded long ago that the governmental/proprietary function distinction is vague and difficult to apply. It is not often easy to determine in a particular case whether the activity is governmental or proprietary. *Roumbos v. City of Chicago*, 332 Ill. 70, 74-75 (1928). Further, a study of cases from other states reveals a wide, unreconcilable divergence as to what functions or activities are governmental and what are proprietary. Many states have abandoned the distinction. 18 McQuillen on Municipal Corporations § 53.24.10 (3d rev. ed. 1993); C. Rhyne, The Law of Local Government Operations § 32.2, at 1042-44 (1980).

However, as we have repeatedly noted, this court abolished sovereign immunity in 1959. *Molitor*, 18 Ill. 2d at 21-22. In response to *Molitor*, the legislature in 1965 enacted the Tort Immunity Act. Also, the 1970 Il-

linois Constitution abolishes the doctrine of sovereign immunity, except as the legislature may provide by statute. Ill. Const. 1970, art. XIII, § 4. The Tort Immunity Act adopted the general principle that local governmental units are liable in tort, but limited this liability with an extensive list of immunities based on specific government functions. Based on these developments, governmental units are liable in tort on the same basis as private tortfeasors unless a tort immunity statute imposes conditions upon that liability. *Barnett v. Zion Park District*, 171 Ill. 2d 378, 386 (1996); *Burdinie*, 139 Ill. 2d at 506-07.

We have explained that the governmental/proprietary function distinction was developed as an exception to and engrafted onto the sovereign immunity doctrine. We have noted that the sovereign immunity doctrine has been abolished and that a governmental unit is liable in tort on the same basis as a private tortfeasor absent an immunity statute. Accordingly, we hold that the governmental/proprietary function distinction does not preclude the application of the Tort Immunity Act. See *Barnett*, 171 Ill. 2d at 387-88; *List v. O'Connor*, 19 Ill. 2d 337, 340 (1960); *Corral v. Chicago Park District*, 277 Ill. App. 3d 357, 361-64 (1995); *Smith v. Godin*, 61 Ill. App. 3d 480, 481 (1978).

### Failure to Supervise

Class plaintiffs contend that the City negligently failed to supervise Great Lakes' pile driving. In granting the City's motion to dismiss, the trial court reasoned that it need not determine whether the City's alleged negligence was "discretionary" or "ministerial" because the City's acts were immunized by section 3—108(a) of the Tort Immunity Act (745 ILCS 10/3—108(a) (West 1994)).

The appellate court affirmed the dismissal. In addition to relying on the plain language of section 3—108(a),

the court additionally concluded that the City's supervision of Great Lakes' pile driving constituted a discretionary activity that immunized the City from liability. We agree with the appellate court.

Tort Immunity Act section 3—108(a) provides in pertinent part:

> "§ 3—108. (a) Except as otherwise provided by this Act *** neither a local public entity nor a public employee is liable for an injury caused by a failure to supervise an activity on or the use of any public property." 745 ILCS 10/3—108(a) (West 1994).

In interpreting this and every other section of the Act, our primary goal is to ascertain and give effect to the intent of the legislature. We seek the legislative intent primarily from the language used in the Tort Immunity Act. We evaluate the Act as a whole; we construe each provision in connection with every other section. If we can ascertain the legislative intent from the plain language of the Act itself, that intent must prevail, and we will give it effect without resort to other interpretive aids. We must not depart from the plain language of the Act by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent. *Barnett*, 171 Ill. 2d at 388-89.

The language of section 3—108(a) is unambiguous. Therefore, as the appellate court reasoned, to override the immunity under that section, class plaintiffs must identify some other provision of the Tort Immunity Act that otherwise limits that immunity.

The discretionary immunity doctrine is codified in sections 2—109 and 2—201 of the Tort Immunity Act (745 ILCS 10/2—109, 2—201 (West 1994)). See *Snyder v. Curran Township*, 167 Ill. 2d 466, 468-69, 473 (1995); see generally D. Baum, *Tort Liability of Local Governments and Their Employees: An Introduction to the Illinois Immunity Act*, 1966 U. Ill. L.F. 981, 988-1000. At common law, a municipality is afforded immunity from liability

for the performance of discretionary acts. However, the municipality is not immune from liability for the performance of ministerial tasks. *City of Chicago v. Seben*, 165 Ill. 371, 377-78 (1897). Although the abolition of sovereign immunity also meant the demise of the governmental/proprietary distinction, the discretionary/ministerial distinction survives. See *Mora v. State*, 68 Ill. 2d 223, 233-34 (1977), quoting *Lusietto v. Kingan*, 107 Ill. App. 2d 239, 244 (1969); *Eck v. McHenry County Public Building Comm'n*, 237 Ill. App. 3d 755, 762-63 (1992); accord 18 McQuillen on Municipal Corporations § 53.04.10 (3d rev. ed. 1993); C. Rhyne, The Law of Local Government Operations § 32.2, at 1044, § 32.21, at 1063 (1980).

This court has explained the discretionary immunity doctrine as follows:

"It is well settled, that municipal corporations have certain powers which are discretionary or judicial in character, and certain powers which are ministerial. \*\*\* Municipal corporations will not be held liable in damages for the manner in which they exercise, in good faith, their discretionary powers of a public, or legislative, or *quasi* judicial character. But they are liable to actions for damages when their duties cease to be judicial in their nature, and become ministerial. [Citations.] Official action is judicial where it is the result of judgment or discretion. Official duty is ministerial, when it is absolute, certain and imperative, involving merely the execution of a set task, and when the law which imposes it, prescribes and defines the time, mode and occasion of its performance with such certainty, that nothing remains for judgment or discretion. [Citation.] A corporation acts judicially, or exercises discretion, when it selects and adopts a plan in the making of public improvements, such as constructing sewers or drains; but as soon as it begins to carry out that plan, it acts ministerially, and is bound to see that the work is done in a reasonably safe and skillful manner." *Seben*, 165 Ill. at 377-78.

Class plaintiffs contend that once the City approved

the pile driving plan, its actions ceased to be discretionary and became ministerial. Thus, according to class plaintiffs, the City is liable for its alleged negligent supervision of Great Lakes.

We agree with the appellate court that the City's supervision of Great Lakes' pile driving was discretionary rather than ministerial. The cases recognize "that, depending upon the situation, what might be considered a repair can be a discretionary matter." *Kennell v. Clayton Township*, 239 Ill. App. 3d 634, 641 (1992), citing *Lusietto*, 107 Ill. App. 2d at 244. In the present case, the contract between the City and Great Lakes provided that "the contractor shall not drive the piles at any other location than that specified by the City," and authorized the City to change its specifications. Thus, the City retained the discretion to locate the pilings in any location it thought best. See *Lusietto*, 107 Ill. App. 2d at 244. This was a matter within the City's discretion for which there is immunity under the Act.

### Willful and Wanton Misconduct

Class plaintiffs alleged that the City's acts constituted willful and wanton misconduct. The trial court denied the City's motion to dismiss, concluding that Tort Immunity Act section 2—201 did not afford the City discretionary immunity. The court ruled that section 2—201 contained an exception for willful and wanton misconduct. The appellate court reversed, holding that section 2—201 does not contain an exception for willful and wanton misconduct. We agree with the appellate court.

Section 2—201 provides as follows:

"§ 2—201. Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such

discretion even though abused." 745 ILCS 10/2—201 (West 1994).

The plain language of section 2—201 is unambiguous. That provision does not contain an immunity exception for willful and wanton misconduct. Where the legislature has chosen to limit an immunity to cover only negligence, it has unambiguously done so. Since the legislature omitted such a limitation from the plain language of section 2—201, then the legislature must have intended to immunize liability for both negligence and willful and wanton misconduct. See *Barnett*, 171 Ill. 2d at 391-92; *West v. Kirkham*, 147 Ill. 2d 1, 6-7 (1992). Cases holding to the contrary (*e.g.*, *Barth v. Board of Education*, 141 Ill. App. 3d 266, 272-74 (1986) (holding that section 2—201 did not immunize willful and wanton misconduct)) are overruled on this point.

### *Failure to Repair or Warn*

The trial court ruled that section 2—201 of the Act did not afford the City discretionary immunity for allegedly failing to promptly repair the tunnel or to warn class plaintiffs of the tunnel breach. The trial court noted class plaintiffs' allegations that the City "did nothing" to repair the tunnel or to warn class plaintiffs. The trial court reasoned that section 2—201 affords immunity only to the exercise of discretion and not for failing to act.

The appellate court affirmed. The appellate court reasoned that it could not find the City immune under section 2—201 as a matter of law because the record lacked facts as to "determinations regarding the decisions or omissions the City made. It must be ascertained what decisions were made, when they were made, by whom, and in what capacity."

We disagree with the trial and appellate courts. Class plaintiffs do not allege that there was any prescribed method for how to repair the tunnel and how

quickly, or how to warn class plaintiffs of the tunnel breach. Thus, the City's actions cannot be considered ministerial. See *Seben*, 165 Ill. at 378.

On the contrary, as the City notes, the City had to make several decisions following its notice of the tunnel breach. Such decisions included who would repair the tunnel, *i.e.*, Great Lakes, the City itself, or an independent contractor; if an independent contractor, then how would the contractor be hired and on what terms. As to the failure-to-warn claim, the City had to decide whether warning the public would cause panic and, if so, whether that warning was justified. All of these decisions were within the City's discretion, which is afforded immunity against liability.

### Conclusion

In sum, we answer the certified questions as follows. The City's proprietary use of the tunnel does not preclude the application of the Tort Immunity Act. Also, the City is afforded discretionary immunity against liability for any alleged negligence in failing to supervise or monitor Great Lakes' pile driving, for any alleged willful and wanton misconduct, and for any alleged negligence in failing to promptly repair the tunnel or warn class plaintiffs of the tunnel damage.

### *Moorman* Doctrine

Class plaintiffs next contend that the appellate court erred in holding that the *Moorman* doctrine bars recovery for those plaintiffs who incurred solely economic losses. On cross-appeal, the City contends that the appellate court erred in holding that *Moorman* does not bar recovery for those plaintiffs who: (1) lost perishable inventory as a result of interrupted electrical service, and (2) incurred "unspecified" property damage. We address these certified questions based on their importance and in furtherance of our responsibility to

maintain a sound and uniform body of precedent. 134 Ill. 2d R. 366(a)(5). Our answers to these certified questions do not affect the applicability of the Tort Immunity Act to these claims.

## Solely Economic Losses

Pursuant to *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982), the trial court barred from recovery those plaintiffs who did not allege physical property damage, but rather only economic loss. The appellate court affirmed, and we agree.

At common law, solely economic losses are generally not recoverable in tort actions. *In re Illinois Bell Switching Station Litigation*, 161 Ill. 2d 233, 240 (1994). The economic loss rule, as a general proposition, is "the prevailing rule in America" (4 F. Harper, F. James & O. Gray, Torts § 25.18A, at 619 (2d ed. 1986)), and is supported by "the vast majority of commentators and cases" (*Moorman*, 91 Ill. 2d at 87-88).

One of the policies behind the economic loss rule is the recognition that the economic consequences of any single accident are virtually limitless. As the City notes, "[i]f defendants were held liable for every economic effect of their negligence, they would face virtually uninsurable risks far out of proportion to their culpability, and far greater than is necessary to encourage potential tort defendants to exercise care in their endeavors." The economic loss rule avoids the consequences of open-ended tort liability. See *In re Illinois Bell Switching Station Litigation*, 161 Ill. 2d at 246-47; *Moorman*, 91 Ill. 2d at 88; 4 F. Harper, F. James & O. Gray, Torts § 25.18A, at 622-23 (2d ed. 1986).

In *Moorman*, this court enunciated the economic loss rule, and held that a products liability plaintiff cannot recover solely economic loss under the tort theories of strict liability, negligence, and innocent misrepresentation. *Moorman*, 91 Ill. 2d at 91. This court described eco-

nomic loss as " 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—*without any claim of personal injury or damage to other property* \*\*\*' [citation]." (Emphasis added.) *Moorman*, 91 Ill. 2d at 82.

In *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 115 Ill. 2d 146 (1986), this court applied the economic loss rule to claims that services were performed negligently. This court also held that "[a] plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract." *Anderson*, 115 Ill. 2d at 153.

This court in *Moorman* articulated three exceptions to the economic loss rule: (1) where the plaintiff sustained damage, *i.e.*, *personal injury or property damage*, resulting from a sudden or dangerous occurrence (*Moorman*, 91 Ill. 2d at 86); (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, *i.e.*, fraud (*Moorman*, 91 Ill. 2d at 88-89); and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions (*Moorman*, 91 Ill. 2d at 89). See *In re Illinois Bell Switching Station Litigation*, 161 Ill. 2d at 240-41. None of these exceptions are present in this case.

Class plaintiffs complain that the application of the economic loss rule to the present case "permits identically situated plaintiffs in the same case to be treated differently for recovery of their damages based solely on the fortuity that one may have suffered property damage along with economic damage." However, the tort recovery requirement of injury to person or property is not a "fortuity." As we explained in *In re Illinois Bell Switching Station Litigation*, 161 Ill. 2d at 241:

"The *Moorman* holding is bottomed upon the theory that tort law affords a remedy for losses occasioned by personal injuries or damage to one's property, but contract law and the Uniform Commercial Code offer the appropriate remedy for economic losses occasioned by diminished commercial expectations not coupled with injury to person or property. The *Moorman* court concluded that qualitative defects are best handled by contract rather than tort law. Tort law [is] 'appropriately suited for personal injury or property damage resulting from a sudden or dangerous occurrence' whereas the remedy for a 'loss relating to a purchaser's disappointed expectations due to deterioration, internal breakdown or nonaccidental cause *** lies in contract.' *Moorman*, 91 Ill. 2d at 86."

Class plaintiffs also characterize the flood as "sudden" or "calamitous." Thus, according to class plaintiffs, "under the recognized exception to *Moorman* for sudden, calamitous events *** the Courts below should have ruled as a matter of law that *Moorman* does not apply to this case and is not a bar to economic damages."

We cannot accept this argument. As we earlier explained, an exception to the economic loss rule is where the plaintiff sustained personal injury or property damage resulting from a sudden or dangerous occurrence. *Moorman*, 91 Ill. 2d at 86. Courts do not speak of a calamitous, sudden, or dangerous event or occurrence to avoid the economic loss rule, but rather to distinguish tort damages from mere economic loss. In other words, the event, by itself, does not constitute an exception to the economic loss rule. Rather, the exception is composed of a sudden, dangerous, or calamitous event coupled with personal injury or property damage.

Clearly, the economic loss rule applies to losses incurred without any personal injury or property damage. *Moorman*, 91 Ill. 2d at 82. However, the economic loss rule applies even to plaintiffs who have incurred physical damage to their property if the damage is caused by disappointed commercial expectations, grad-

ual deterioration, internal breakage, or other nonacci-
dental causes, rather than a dangerous event. *Redaro-
wicz v. Ohlendorf*, 92 Ill. 2d 171, 177-78 (1982) (and
authorities cited therein); *Moorman*, 91 Ill. 2d at 86. For
damages to be recoverable in tort, the sudden, danger-
ous, or calamitous occurrence must still result in
personal injury or property damage. Absent injury to a
plaintiff's person or property, a claim presents an eco-
nomic loss not recoverable in tort. See *Northern Illinois
Gas Co. v. Vincent DiVito Construction*, 214 Ill. App. 3d
203, 218-19 (1991). We agree with the trial and appel-
late courts that those plaintiffs who did not incur
personal injury or property damage may not recover
solely economic losses.

### Lost Perishable Inventory

The trial court ruled that the economic loss rule
does not bar recovery in tort for those plaintiffs who lost
perishable inventory as a result of interrupted electrical
service. The appellate court affirmed. We agree.

When property damage is caused by disappointed
commercial expectations, the economic loss rule bars
recovery in tort. *Redarowicz*, 92 Ill. 2d at 177-78. Rather,
"[t]o recover in negligence there must be a showing of
harm above and beyond disappointed expectations." *Re-
darowicz*, 92 Ill. 2d at 177. For example, in *Redarowicz*,
the court held that plaintiff's property damage was
caused by a construction defect, which was a disap-
pointed commercial expectation. Thus, plaintiff's dam-
ages were solely economic losses. However, the court
indicated that had plaintiff suffered personal injury or
other property damage, he would have been able to re-
cover in tort:

> "This is not a case where defective construction created a
> hazard that resulted in a member of the plaintiff's family
> being struck by a falling brick from the chimney. *The
> adjoining wall has not collapsed on and destroyed the*

*plaintiff's living room furniture.* The plaintiff is seeking damages for the costs of replacement and repair of the defective chimney, adjoining wall and patio. While the commercial expectations of this buyer have not been met by the builder, the only danger to the plaintiff is that he would be forced to incur additional expenses for living conditions that were less than what was bargained for." (Emphasis added.) *Redarowicz,* 92 Ill. 2d at 178.

In the present case, class plaintiffs do not seek damages for the loss of continuous electrical service, which is a disappointed commercial expectation. See *In re Illinois Bell Switching Station Litigation,* 161 Ill. 2d at 240-41. Rather, class plaintiffs seek damages for property loss, in the form of lost perishable inventory, as a result of a tortious event. Such damages are above and beyond class plaintiffs' disappointed commercial expectation in continuous electrical service. Thus, these losses fall outside the definition of economic loss and are recoverable in tort. See *Scott & Fetzer Co. v. Montgomery Ward & Co.,* 112 Ill. 2d 378, 388 (1986); *Moorman,* 91 Ill. 2d at 86.

### Unspecified Property Damage

The trial court also ruled that the economic loss rule did not bar recovery for those plaintiffs who incurred "unspecified" property damage. The appellate court affirmed. We disagree.

Class plaintiffs must plead facts identifying the type of property damage that they incurred. See *People ex rel. Fahner v. Carriage Way West, Inc.,* 88 Ill. 2d 300, 308 (1981). The conclusory allegation of unspecified property damage is insufficient to show that their damages are recoverable in tort, and cannot withstand a motion to dismiss. See *Knox College v. Celotex Corp.,* 88 Ill. 2d 407, 426-28 (1981).

We note class plaintiffs' argument that subsequent discovery has produced and will continue to produce evidence of the type of property damage alleged. Thus, ac-

cording to class plaintiffs, the City has been or will be advised of the specific property damage alleged. To dismiss the claims for lack of specificity in the complaint would be pointless because class plaintiffs would simply replead with more specificity to conform to currently known facts.

Of course, this argument lacks merit. This was a section 2—615 motion to dismiss. The motion attacks only the legal sufficiency of the complaint. The only matters for the court to consider in ruling on the motion are the allegations of the pleadings themselves, rather than the underlying facts. Thus, the court may not consider affidavits, the products of discovery, documentary evidence not incorporated into the pleadings, or other evidence in ruling on a section 2—615 motion. *Urbaitis v. Commonwealth Edison*, 143 Ill. 2d 458, 475 (1991); See *Barber-Colman Co. v. A&K Midwest Insulation Co.*, 236 Ill. App. 3d 1065, 1068-69 (1992).

### Conclusion

In sum, we answer the certified questions as follows. The *Moorman* doctrine bars the claims of those plaintiffs who allege only economic loss. However, the *Moorman* doctrine does not bar the claims of those plaintiffs who seek tort recovery for loss of perishable inventory due to interrupted electrical service. Also, the *Moorman* doctrine bars the claims of those plaintiffs who seek tort recovery for unspecified property damage. These answers do not affect the applicability of the Tort Immunity Act to these claims.

### Nuisance

The trial court dismissed Hartford's nuisance claim as to those plaintiffs who did not suffer a physical invasion of their property by the flood waters. The appellate court upheld this denial of recovery, and Hartford appeals therefrom. Also, the trial court, pursuant to *Moor-*

*man*, dismissed Hartford's nuisance claim as to those plaintiffs who did not incur any property damage, but rather incurred only an economic loss. However, the appellate court reversed the trial court's application of *Moorman* to the nuisance claim. The appellate court held that the *Moorman* doctrine does not apply to nuisance claims. On cross-appeal, the City assigns error to this holding.

### Physical Invasion

In its complaint, Hartford alleged that its subrogors were evacuated from their places of business. Hartford concludes that the evacuation was an unreasonable and substantial invasion of plaintiffs' property. Thus, according to Hartford, the complaint states a cause of action for nuisance as to all of its subrogors.

A private nuisance is a substantial invasion of another's interest in the use and enjoyment of his or her land. The invasion must be: substantial, either intentional or negligent, and unreasonable. *Pasulka v. Koob*, 170 Ill. App. 3d 191, 208 (1988); *Statler v. Catalano*, 167 Ill. App. 3d 397, 403 (1988). The standard for determining if particular conduct constitutes a nuisance is the conduct's effect on a reasonable person. *Belmar Drive-In Theatre Co. v. Illinois State Toll Highway Comm'n*, 34 Ill. 2d 544, 547 (1966).

The type of invasion that nuisance protects differs from the type of invasion that trespass protects. "A trespass is an invasion of the interest in the exclusive possession of land, as by entry upon it. *** A nuisance is an interference with the interest in the private use and enjoyment of the land, and does not require interference with the possession." Restatement (Second) of Torts § 821D, Comment *d*, at 101 (1979); see *Colwell Systems, Inc. v. Henson*, 117 Ill. App. 3d 113, 116-17 (1983).

Agreeing with the trial court, the appellate court held that "some type of invasion is necessary to state an

action for nuisance and that the physical invasion of water constituted such an invasion. *** [W]e affirm the trial court's decision to dismiss only those plaintiffs whose property was not physically invaded by the flood."

Hartford assigns error to this holding. Hartford argues that "[t]he *sine qua non* of nuisance is not 'invasion' of plaintiff's premises, but rather the use of land by one party that interferes with the ability of another to enjoy and use his own property. Invasion may be coincidental to a successful claim for private nuisance, but it is not mandatory."

We cannot accept Hartford's contention. It is true that a private nuisance is described as a substantial *interference* with another's use and enjoyment of his or her property. Nonetheless, that interference is generally and traditionally thought of as an *invasion*, albeit a nontrespassory one. See Restatement (Second) of Torts § 821D, at 100 (1979); 3 J. Lee & B. Lindahl, Modern Tort Law § 35.04, at 197 (1990).

In other words, the interference with the use and enjoyment of property must consist of an invasion by something perceptible to the senses. In private nuisance, the typical activity at issue does not result in a crass physical invasion, as in trespass, but rather results in an invasion of another's use and enjoyment of his or her property. 1 F. Harper, F. James & O. Gray, Torts § 1.23, at 82-83 (2d ed. 1986); 3 J. Lee & B. Lindahl, Modern Tort Law § 35.10, at 203 (1990); see, *e.g.*, *Woods v. Khan*, 95 Ill. App. 3d 1087, 1090 (1981) ("The invasion of their land [by odors and flies] was both substantial and intentional").

This court has repeatedly described a nuisance as "something that is offensive, physically, to the senses and by such offensiveness makes life uncomfortable." *Rosehill Cemetery Co. v. City of Chicago*, 352 Ill. 11, 30 (1933) (and cases cited therein). "Typical examples would

be smoke, fumes, dust, vibration, or noise produced by defendant on his own land and impairing the use and enjoyment of neighboring land." 1 F. Harper, F. James & O. Gray, Torts § 1.23, at 76 (2d ed. 1986); see 3 J. Lee & B. Lindahl, Modern Tort Law § 35.11 (1990). Thus, as the appellate court noted, Illinois courts have allowed nuisance actions where the alleged invasion consisted of, *e.g.*, noise and odors (*People ex rel. Traiteur v. Abbott*, 27 Ill. App. 3d 277, 282 (1975)), or odors and flies from a poultry farm (*Woods*, 95 Ill. App. 3d at 1090); another example of a nuisance is the shooting of a bullet into another's home (*Statler*, 167 Ill. App. 3d at 403).

In the present case, Hartford does not allege that those businesses whose property was not physically invaded by the flood waters suffered any other type of invasion of the use and enjoyment of their property. There is no allegation of noxious fumes or disagreeable odors, other types of seepage, disagreeable noises, or any other type of invasion. We assume that the evacuation of those businesses was psychologically depressing. However, absent any perceptible element that would influence the physical senses to make the location of those businesses less desirable, the complaint fails to state a cause of action for private nuisance. See *Rosehill*, 352 Ill. at 28-30.

### *Moorman*

Also, pursuant to *Moorman*, the trial court dismissed Hartford's nuisance claim as to those plaintiffs who did not incur any injury to their persons or property, but rather incurred only economic loss. The appellate court reversed, holding that the *Moorman* doctrine does not bar an otherwise proper nuisance claim.

The trial court correctly recognized that private nuisance is a tort. Restatement (Second) of Torts § 822, Comment *a*, at 109 (1979); W. Keeton, Prosser & Keeton on Torts § 87, at 622 (5th ed. 1984). Although the appel-

late court recognized this, it nevertheless held that the rule of *Moorman* does not apply to nuisance claims, reasoning that:

> "the application of *Moorman* to nuisance actions would completely gut the very basis of the action in that most nuisance claims are based upon a non-physical force such as noise, odor, smoke, dust, or even flies. Clearly, in these cases, there is no property damage in a *Moorman* context, yet such actions have all been sustained in Illinois courts."

The trial court correctly applied *Moorman* to Hartford's nuisance claim. The court recognized the previously discussed policy behind the economic loss rule that the economic consequences of any single accident are virtually limitless. As stated earlier, the economic loss doctrine avoids the consequences of open-ended tort liability. *Moorman*, 91 Ill. 2d at 88; see *In re Illinois Bell Switching Station Litigation*, 161 Ill. 2d at 246-47. We agree with the trial court that "there is no reason to treat the tort of nuisance *** differently from any other tort." Accord *Dick Meyers Towing Service, Inc. v. United States*, 577 F.2d 1023, 1025 n.4 (5th Cir. 1978); *In re Complaint of Marine Navigation Sulphur Carriers, Inc.*, 507 F. Supp. 205, 210 (E.D. Va. 1980), *aff'd*, 638 F.2d 700 (4th Cir. 1981).

A plaintiff in a private nuisance action may recover all consequential damages flowing from the injury to the use and enjoyment of his or her person or property. See *Schatz v. Abbott Laboratories, Inc.*, 51 Ill. 2d 143 (1972). However, recovery of damages for solely economic loss is not permissible. See 4 F. Harper, F. James & O. Gray, Torts § 25.18A, at 622-23 (2d ed. 1986).

Abnormally Dangerous or Ultrahazardous Activity

Class plaintiffs and Hartford next contend that the appellate court erred in upholding the trial court's dismissal of their strict tort liability claims. Class plaintiffs and Hartford allege that pile driving and the mainte-

nance of a tunnel under a riverbed are abnormally dangerous or ultrahazardous activities.

A defendant who performs an abnormally dangerous or ultrahazardous activity (terms which we regard as synonymous) is subject to liability for harm to the person, land, or chattels of a plaintiff resulting from the activity, although the defendant has exercised the utmost care to prevent the harm. Restatement (Second) of Torts § 519, at 34 (1977). This doctrine derives from an English case, *Fletcher v. Rylands*, L.R. 3 H.L. 330 (1868). *Rylands* has come to stand for the principle that "the defendant will be liable when he damages another by a thing or activity unduly dangerous and inappropriate to the place where it is maintained, in the light of the character of that place and its surroundings." W. Keeton, Prosser & Keeton on Torts § 78, at 547-48 (5th ed. 1984). This general principle is recognized in Illinois. See, *e.g.*, *Miller v. Civil Constructors, Inc.*, 272 Ill. App. 3d 263, 265-66, 269 (1995); *Continental Building Corp. v. Union Oil Co.*, 152 Ill. App. 3d 513, 515-16 (1987); *Fallon v. Indian Trail School, Addison Township School District No. 4*, 148 Ill. App. 3d 931, 933-34 (1986).

This is referred to as "strict" tort liability because the defendant's negligence or lack thereof is irrelevant. Rather, the liability arises out of the abnormal danger of the activity itself, and the risk that it creates, of harm to those in the vicinity. It is based on a policy of the law that imposes upon anyone, who for her own purposes creates an abnormal risk of harm to her neighbors, the responsibility of relieving against that harm when it does in fact occur. In other words, the defendant's enterprise is required to pay its way by compensating for the harm it causes because of its special, abnormal, and dangerous character. Restatement (Second) of Torts § 519, Comment *d*, at 35 (1977); see *G.L. Leasing Co. v. Union Electric Co.*, 54 F.3d 379, 386-87 (7th Cir. 1995).

Section 520 of the Restatement (Second) of Torts sets forth the following factors to be considered in defining an abnormally dangerous or ultrahazardous activity:

"(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes." Restatement (Second) of Torts § 520, at 36 (1977).

Illinois courts have traditionally used the terms "ultrahazardous," "abnormally dangerous," "intrinsically dangerous," or "inherently dangerous" to refer to "that type of danger which is inherent in the instrumentality itself at all times" and not "danger which arises from mere casual or collateral negligence of others with respect to it under the particular circumstances. More concisely, it means dangerous in its normal or nondefective state." *Fallon*, 148 Ill. App. 3d at 935, citing *Clark v. City of Chicago*, 88 Ill. App. 3d 760, 763 (1980). The trial court correctly noted that this description correlates to the first and third factors of the Restatement analysis. However, liability for abnormally dangerous or ultrahazardous activities is not a matter of these factors alone. All of the factors are to be considered. Restatement (Second) of Torts § 520, Comment *h*, at 39 (1977).

Any single factor in section 520 alone is not necessarily sufficient for the conclusion that an activity is abnormally dangerous or ultrahazardous. Conversely, it

is not necessary that each factor be present, especially if other factors weigh heavily:

"The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care. In other words, are its dangers and inappropriateness for the locality so great that, despite any usefulness it may have for the community, it should be required as a matter of law to pay for any harm it causes, without the need of a finding of negligence." Restatement (Second) of Torts § 520, Comment *f*, at 37-38 (1977).

The question whether an activity is abnormally dangerous or ultrahazardous is one of law for the court. Restatement (Second) of Torts § 520, Comment *l*, at 42 (1977).

Reviewing the six Restatement factors, the appellate court agreed with the trial court that neither pile driving nor the maintenance of the tunnel was an abnormally dangerous or ultrahazardous activity. The appellate court concluded that class plaintiffs' and Hartford's complaints lacked sufficient facts to support the first three factors.

We note class plaintiffs' and Hartford's argument that pile driving is inherently or intrinsically dangerous. They reason that since pile driving produces uncontrollable vibrations and concussions similar to blasting, which courts generally consider to be inherently or intrinsically dangerous, then pile driving should likewise be subject to strict tort liability. See, *e.g., Cincinnati Terminal Warehouses, Inc. v. Contractor, Inc.*, 324 N.E.2d 581, 582 (Ohio App. 1975) (collecting cases). However, other courts have rejected this analogy, reasoning:

"In our opinion, the common factor, vibrations, is not sufficient to place the case under consideration in the same category as blasting cases. Machines, motors and instru-

mentalities which cause vibrations are in such common use in present-day activities and the probability of damage from their use is so variable that the mere fact that all of them cause vibrations is not a reasonable basis for common classification for liability. There are many cases involving damage by vibrations set in motion by instrumentalities other than explosives, *e.g.*, pile drivers, drills, pavement breakers, etc. The overwhelming majority require allegation and proof of negligence. [Citations.]" *Trull v. Carolina-Virginia Well Co.*, 264 N.C. 687, 691-92, 142 S.E.2d 622, 625 (1965).

We agree with the appellate court that class plaintiffs' and Hartford's complaints failed to sufficiently allege facts to meet the first three factors of section 520. The complaints pled their conclusion—pile driving is inherently or intrinsically dangerous—without pleading sufficient facts showing why. Such a complaint cannot withstand a motion to dismiss. See *Knox*, 88 Ill. 2d at 426-28.

Regarding the fourth factor of section 520, the appellate court concluded that pile driving is common to construction projects, and that underground tunnels and similar structures are commonly maintained by public and private entities in commercial and noncommercial settings. We disagree with this conclusion as it relates to pile driving. It appears to stand for the general proposition that a common industry practice cannot be considered to be abnormally dangerous or ultrahazardous.

The Restatement (Second) of Torts § 520, Comment *i*, at 39 (1977), explains that "[a]n activity is a matter of common usage if it is customarily carried on by the great mass of mankind or by many people in the community." This comment gives the following examples of activities that are not matters of common usage: driving a tank; blasting; the manufacture, storage, transportation, and use of high explosives; and drilling for oil. Restatement (Second) of Torts § 520, Comment *i*, at 40

(1977). The common and deciding characteristic is that few persons engage in these activities. In this case, tunnels under riverbeds are created, maintained, and used by the great mass of humanity, or at least by thousands of persons in Chicago every day. However, relatively few persons engage in pile driving.

Regarding the fifth factor, the appellate court noted that the only way to replace the deteriorated pilings around the Kinzie Street bridge was to drive more pilings into the river. Even if pile driving were inherently or intrinsically dangerous (see *Fallon*, 148 Ill. App. 3d at 935; Restatement (Second) of Torts §§ 520(a), (c) (1977)), the Restatement comment to the fifth factor explains that some such activities "can be carried on only in a particular place. *** If these activities are of sufficient value to the community (see Comment *k*), they may not be regarded as abnormally dangerous when they are so located, since the only place where the activity can be carried on must necessarily be regarded as an appropriate one." Restatement (Second) of Torts § 520, Comment *j*, at 41-42 (1977).

Regarding the sixth factor, the appellate court correctly noted that the Loop is accessible only by many of the bridges that link it with the rest of the city, and that the piling replacement project was necessary to maintain the bridges as part of the public transportation system. The appellate court also correctly noted that "the management of underground tunnels [specifically, we note, tunnels under riverbeds] to move freight, transport commuters, house utility lines, and disperse waste is a necessary urban activity."

After considering the factors of section 520 of the Restatement (Second) of Torts, we agree with the appellate court's conclusion that the pile driving and the maintenance of the tunnel were not abnormally dangerous or ultrahazardous activities. Accordingly, we uphold

the trial court's dismissal of class plaintiffs' and Hartford's strict tort liability claims.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is affirmed in part and reversed in part, the judgment of the circuit court is affirmed in part and reversed in part, and the cause is remanded to the circuit court of Cook County.

*Appellate court judgment affirmed in part*
*and reversed in part;*
*circuit court affirmed in part*
*and reversed in part;*
*cause remanded.*

JUSTICE McMORROW, concurring in part and dissenting in part:

I dissent from two of the holdings in the majority opinion. For the reasons more fully stated in my dissenting opinion in *Barnett v. Zion Park District*, 171 Ill. 2d 378, 399 (McMorrow, J., dissenting) and because I do not believe that the legislature intended to immunize willful and wanton misconduct, I dissent from the majority's holding that willful and wanton misconduct is shielded by the immunity contained in section 2—201 of the Tort Immunity Act. Additionally, I dissent from the majority's holding that the discretionary immunity doctrine insulates the City, as a matter of law, from liability for failing to repair the tunnel damage upon notice of the breach and for failing to warn plaintiffs of the risks of harm resulting from the breach. I briefly address each point in turn.

The majority's disposition of the willful and wanton counts in the complaint is premised on the reasoning that tortious conduct of a willful and wanton nature is immunized by a particular provision of the Tort Immunity Act whenever such conduct is not expressly

excluded from the immunity provision in issue. As I noted in my dissent in *Barnett*, the rationale underlying a grant of immunity for simple negligence is different in kind from any justification for immunizing tortious conduct that is intentionally harmful or willful and wanton. This critical distinction has long been noted in Illinois decisions. See, *e.g.*, *McCormick v. Burt*, 95 Ill. 263, 266 (1880) (recognizing immunity for *good-faith* errors in public official's discretionary judgment, where no allegations were made that official acted "either *wantonly* or maliciously" (emphasis added)); accord *Barth v. Board of Education*, 141 Ill. App. 3d 266, 273-74 (1986). Today, the majority expressly overrules *Barth* and other cases which hold that section 2—201 of the Tort Immunity Act does not immunize willful and wanton misconduct. I do not join in this ruling.

I further note that the decision upon which the majority relies for much of its explanation of the discretionary immunity doctrine, *City of Chicago v. Seben*, 165 Ill. 371 (1897), stated, "Municipal corporations will not be held liable in damages for the manner in which they exercise, *in good faith*, their discretionary powers of a public, or legislative, or *quasi* judicial character." (Emphasis added.) *Seben*, 165 Ill. at 377-78, quoted in 176 Ill. 2d at 194. As the *Seben* court implicitly recognized in the above passage, good faith is a component of discretionary immunity. Good faith is incompatible with willful and wanton misconduct.

My second point of departure from the majority opinion involves the application of discretionary immunity to those counts of the complaint alleging that the City breached its duty to repair the tunnel damage upon notice of the breach and to warn class plaintiffs of the harm presented by the breach. The trial court denied the City's motion to dismiss those counts of the complaint, and the appellate court affirmed the denial

of that motion to dismiss. In reversing the appellate court on this issue, the majority concludes that the City is entitled to what is, in effect, unlimited immunity under the discretionary immunity doctrine. The majority explains that plaintiffs are barred from proceeding on the counts based on the City's failure to repair and failure to warn because the plaintiffs "do not allege that there was any *prescribed method* for how to repair the tunnel and how quickly, or *how to warn* class plaintiffs of the tunnel breach. Thus, the City's actions cannot be considered ministerial. See *Seben*, 165 Ill. at 378." (Emphasis added.) 176 Ill. 2d at 196-97.

It would appear from the above holding that the majority bases the City's discretionary immunity upon the failure of plaintiffs to plead specified methods, rules, or policies governing repairs and warnings. This suggests that such methods, rules, or policies actually exist, or that the existence of preformulated "rules of repair" or warning procedures is essential to stating a cause of action for failure to repair and warn. No authority is cited for this novel interpretation of the discretionary immunity doctrine, except for *Seben*. However, *Seben* does not hold that a municipality's inaction or failure to repair a known potentially dangerous condition is immunized if there are no set policies or rules in place for directing the specific repair. Indeed, it is curious that the majority does not acknowledge that the *Seben* court's analysis actually favors a finding that the acts or omissions in the case at bar were ministerial rather than discretionary. The *Seben* court affirmed a verdict in favor of an injured plaintiff despite the City's attempt to characterize its acts or omissions in connection with an open and uncovered catch basin as discretionary and therefore immune. The court noted, "A municipal corporation acting in good faith is not liable for any error of judgment in constructing a system of drainage.

\*\*\* The adoption of a general plan of sewerage involves the performance of a duty of a *quasi* judicial character, but the construction and regulation of sewers *and the keeping of them in repair*, \*\*\* are ministerial duties, and the municipality, which constructs and owns such sewers, is liable for the negligent performance of such duties." (Emphasis added.) *Seben*, 165 Ill. at 378-79. It would appear, therefore, that the reasoning and result in *Seben* require the opposite holding from the one reached by the majority on the issue of failure to repair.

In justifying the City's failure to warn as a discretionary decision cloaked with immunity, the majority states that the City "had to decide whether warning the public would cause panic and, if so, whether that warning was justified." 176 Ill. 2d at 197. I cannot join in this reasoning insofar as it implies that the legal standard for deciding whether failure to warn of a known danger is immunized as a matter of law is whether such a warning might cause panic.

I note also that the burden of establishing entitlement to immunity, as an affirmative defense, is on the City. The Tort Immunity Act contains no express immunity for failing to repair a known hazardous condition on City property or for failing to warn affected individuals of the risks of harm. As the majority acknowledges in its opinion, private entities and public entities are equally liable in tort, except as the legislature expressly provides through the passage of express immunity statutes. Because I am not persuaded that the discretionary immunity doctrine insulates the City from liability for failure to repair the tunnel and warn potential victims that they lay in harm's way, I do not join the majority's decision to grant the City immunity as a matter of law on this issue.

For the reasons stated, I dissent in part from the opinion of the majority.