**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190320-U

Order filed August 26, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| CONNIE PAGE, | ) | Appeal from the Circuit Court |
| | ) | of the 13th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Grundy County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-19-0320 |
| | ) | Circuit No. 17-L-21 |
| VILLAGE OF COAL CITY, | ) | |
| | ) | The Honorable |
| Defendant-Appellee. | ) | Lance R. Peterson, |
| | ) | Judge, presiding. |

_____

JUSTICE DAUGHERITY delivered the judgment of the court.
Presiding Justice O'Brien and Justice McDade concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:    Defendant was immune from liability pursuant to sections 2-109 and 2-201 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/2-109, 2-201 (West 2016)), where defendant made a conscious decision for the area of the roadway at issue, which had been excavated and filled with gravel, to remain unpaved and open to traffic and that decision was both a discretionary decision and a policy decision.

¶ 2    Plaintiff, Connie Page, filed a complaint against defendant, Village of Coal City, alleging

negligence in the maintenance and repair of a portion of the road where she had been involved in

a motorcycle accident. Defendant filed a motion for summary judgment, which the trial court granted. Plaintiff filed a motion to reconsider, which was denied. Plaintiff appeals, arguing the trial court erred in granting defendant's summary judgment motion and denying her motion to reconsider because: (1) defendant was not immune from liability pursuant to sections 2-109 and 2-201 of the Local Governmental and Governmental Employees Tory Immunity Act (Tort Immunity Act) (745 ILCS 10/2-109, 2-201 (West 2016)); (2) even though the gravel section of the road at issue was open and obvious, defendant had reason to anticipate or expect that a reasonable person in plaintiff's position would deliberately encounter those portions of the road; and (3) a material issue of fact remained as to the proximate cause of the motorcycle accident. We affirm.

¶ 3                            I. BACKGROUND

¶ 4         Plaintiff filed a negligence complaint against defendant, alleging the following in pertinent part: on July 23, 2016, plaintiff was traveling southbound on her motorcycle on North 5th Avenue, at or near East 3rd Street, in the Village of Coal City, Illinois, when the tires of her motorcycle came into contact with a section of loose gravel and, as a result of the sudden change in the level of the adjoining roadway and the change from the pavement to loose gravel, plaintiff lost control and was thrown from her motorcycle; prior to that time, defendant had removed portions of the pavement at that location, leaving a 4 foot by 42 foot patch of gravel in its place; there was a "substantial variant" in height between the surface of the gravel and the surrounding pavement, with the surrounding pavement being substantially higher than the gravel; and the gravel was loose and not compact. Plaintiff additionally alleged, in relevant part, that defendant was negligent by: (1) removing a significant patch of the roadway; (2) carelessly and negligently planning and designing North 5th Avenue at or near East 3rd Street; (3) permitting a 4 foot by 42

2

foot section of the roadway to remain unpaved; and (4) failing to repair or replace the missing pavement that had been replaced by gravel. Plaintiff further alleged that because of defendant's wrongful actions, she was thrown from her motorcycle after her tires came in contact with the unpaved section of the roadway and, as a direct and proximate result of that fall, she was severely and seriously injured. Defendant denied the allegations and filed affirmative defenses, which included a claim of comparative negligence and allegations that plaintiff: (1) failed to watch where she was driving; (2) failed to use the paved section of the lane, which comprised more than half of the lane; (3) failed to keep a safe and proper lookout; (4) failed to observe a condition that was open and obvious or could reasonably be expected to be discovered by plaintiff; (5) failed to use protective riding gear, including a helmet; and (6) operated her motorcycle while impaired and under the influence of opiates.

¶ 5        Thereafter, defendant filed a motion for summary judgment, arguing the decision to do the repair work involved a discretionary decision by the Director of the Public Works, Darrell Olson, which was immune from liability under sections 10/2-109 and 10/2-201 of the Tort Immunity Act. Alternatively, defendant argued that the alleged condition of the roadway was open and obvious and, additionally, that there was no evidence indicating that the alleged condition of the roadway was the proximate cause of plaintiff's motorcycle crash. In support of its motion for summary judgment, defendant attached various documents, including the deposition transcripts of plaintiff and Darrell Olson, photographs of the portion of the roadway at issue, and the affidavit of Pamela Carlton, who had witnessed the crash.

¶ 6        In his deposition, Olson testified that work done by the Public Works Department involved maintaining streets and roadways in the Village of Coal City. Olson described two ways to repair potholes—cold patching and hot patching. Due to budgetary reasons, defendant's

own employees completed road work involving cold-patching and preparing the road for hot patching, while the actual application of hot-mix asphalt to the gravel was contracted out. Defendant did not have the equipment or resources to apply the hot-mix asphalt. In preparation for hot patching/paving by the hired contractor, Public Works Department employees would prepare the area in advance by digging up and removing asphalt, redoing the grade for the base, and filling the hole. After doing the preparation work for hot patching and prior to the hot-mix being rolled out by the contractor, defendant would add more gravel or spread out the existing gravel in an area, as needed. When the hot patching was subsequently done by the contractor, it would be placed down and rolled out immediately. Olson noted that cold patching was only a temporary fix and cost almost two or three times as much as hot patching.

¶ 7 Olson indicated that road repairs would be done when a road became bad enough to warrant a repair, which would be decided by Olson or a board trustee. Olson inspected the roads four times per year to identify areas of road in need of repair. He would also inspect an area of road after a complaint was received about that certain area. If Olson determined that an area needed to be repaired, he would assess "how bad it [was]" and decide whether the repairs were to be immediately done or if the repairs could be held off until the contractor came in to do the annual paving for the Village. If Olson decided that a repair was necessary on an expedited basis, within the next few days the Public Works Department employees would "core it out" down to the base, put in different aggregate (stone/road mix), and roll it to compact it. Those repairs would be checked approximately every two weeks to see if additional gravel was needed. Thereafter, usually in October, everything would get paved by the contractor. If a repair was not immediately necessary and could be held off until the time the contractor came in to do the paving, the area would not be cored out until that time.

4

¶ 8    Olson testified that at a Streets and Alley Committee meeting on March 3, 2016, an issue with water being retained on North 5th Avenue was discussed. Olson explained that if the shoulder was too high and water was standing on the road, the shoulder of the road would be cored out and graded to the point that water could run off. Olson indicated that at the meeting on March 3, 2016, a trustee had indicated that North 5th Avenue was a problem, especially "onto the edges." As a result of that complaint, a decision was made to remove the damaged pavement on North 5th Avenue and have it repaved by the contractor (D Construction). At the time of the meeting on March 3, 2016, the committee and Olson understood that the existing pavement should be removed, even if it would remain unpaved for a period of time, because the existing condition of the road was more dangerous than it would be if were excavated, filled with gravel, and compacted.

¶ 9    Olson also testified that after that meeting, the condition of the road at issue worsened, so "that's why [they] ended up doing it when [they] did" in June. He explained that from water sitting on the road, the road alligatored (began cracking) and, when a road started to alligator, it would begin to lift. He stated, "when it started lifting, that becomes a road hazard." The repair work at issue was done right after the start of the fiscal year so having sufficient funds was not a concern to Olson. He, therefore, made the decision to proceed with the repair. Olson indicated that deciding whether to remove the pavement from an existing roadway was based on a myriad of considerations, including the size and location of the pavement being removed, the condition of the shoulder of the road and ditches around the area, and other pressing needs and priorities of the Village.

¶ 10    In his deposition, Olson was shown two photographs that he had taken of the area of the road at issue a few days to a week after the crash. He testified that between May 31 and June 13,

2016, Public Works Department employees had cut out a portion of the road, filled it with aggregate (two-inch stone, three-quarter inch stone, and road mix), and rolled it—(the "June repair"). The loose road mix/aggregate (hereinafter "gravel") was compacted with the roller. After the excavated area was filled with gravel and rolled, it would have been flush with the surrounding pavement. The area was subsequently paved by a contractor a few months later, in September or October. In the meantime, the area was open for traffic, so it was possible for some of the gravel to come out when cars drove over it, which was something that Olson monitored for until paving was complete. Olson also testified that if Public Works Department employees "s[aw] something low, they will go ahead and add [gravel]" on their own accord without having to ask Olson prior to doing so. Olson would also instruct employees to refill or rake gravel areas at times.

¶ 11        Olson additionally testified that he knew for sure "at some point" more gravel had been added to the area at issue on two occasions. He further testified that prior to the time he took the photographs of the area at issue (a few days to a week after plaintiff's accident), he had instructed Public Works Department employees to "pull back" into the excavated area (presumably by raking) some gravel that had been moved onto the shoulder of the road and roll it. He testified that he had specifically remembered doing so because he had passed the area at issue on his way to work, noticed it was low, and instructed the Public Works Department employees to take care of it at that time. Olson testified that the area at issue was "just as hard as the pavement" and was not loose. He also indicated the gravel area could degrade "over time" from vehicles passing over it. Olson testified when he took photographs of the rectangle gravel area at issue (a few days to a week after the accident) he believe the east edge of the area was low (the side toward the center of the roadway), which was caused by traffic. He testified

indicated that area of the road was, however, not any less stable or hard than that pavement, the gravel was not loose, and the area at issue was in a reasonably safe condition for cars or motorcycles to travel over it.

¶ 12 Olson additionally testified that the contractor, D Construction, only did resurfacing for defendant one time per year because the scope of the work that needed to be done. Olson explained that D Construction was hired to do all the resurfacing one time per year for two or three days because doing a few patches at different times was not cost effective. It would cost the Village more to have D Construction come out every time a patch was needed, and there was not enough money in the budget to do it that way. Defendant did not perform its own hot patching work because: cost considerations, the limited number of employees in the Public Works Department, it was less expensive to have paving done by the contractor one time per year, and the Public Works Department did not have the resources or equipment to do hot patching.

¶ 13 Olson described the area of North 5th Avenue that is at issue as a two-way street, with one lane running north and the other lane running south. He also testified the rectangle gravel area at issue took up less than half of the southbound lane and someone operating a motorcycle would have had enough room on the pavement portion to drive around the gravel section in the southbound lane. Olson testified that he had formed the opinion that the area of the road at issue was reasonably safe for motorcycle traffic after the excavation work because the gravel section took up less than half of the lane, the speed limit was only 25 miles per hour, and the repaired sections were apparent and visible to oncoming drivers so that they were able to drive around the area at issue. A motorcyclist traveling in that southbound lane would have had the option to avoid the gravel area by riding on the pavement portion of the lane or travel straight over the

7

gravel section, which was safe to do. There was adequate room for a motorcyclist to remain on the pavement of the lane even if another vehicle was traveling in the northbound lane.

¶ 14    In her deposition, plaintiff testified that she did not remember the day of the accident after 2 p.m. or 3 p.m., and the motorcycle accident took around 6:57 p.m. Plaintiff was informed after the accident that she had been traveling on the road at issue with her friend David riding a motorcycle in front of her and her friend Michael riding a motorcycle behind her. Plaintiff testified, "[t]hey said I hit the gravel, that's what threw me." Plaintiff spoke with David after the accident, who told her that she was already falling to the ground when he looked in his mirror at the time of the accident. Plaintiff has never spoken with Michael about the accident or about how she fell. After viewing a photograph of the gravel portion of the road at issue, plaintiff acknowledged that there had been room to go around the gravel section and she was not aware of any reason why she could not have done so. She also indicated the gravel area at issue would have been visible and that it was not a hidden condition. Plaintiff did not know where she had been looking at the time of the accident. She testified, after looking at photographs of the area at issue (taken by Olson a few days to a week after the accident), there was a height variance between the gravel and the roadway but she could be tell how much of a height variance.

¶ 15    In her affidavit, Pamela Carlton averred that she had witnessed plaintiff's motorcycle accident and that she was traveling in her vehicle in the opposite-direction (in the northbound lane). Just prior to the accident Carlton, observed three motorcycles traveling southbound in a single file. Carlton further indicated that she had observed the second motorcycle (plaintiff's motorcycle) travel through the section of the roadway filled with gravel and crash. Carlton indicated that she did not observe anything that would have blocked plaintiff's view of the gravel

8

section of the roadway, noting that the gravel section "was large" and plaintiff should have been able to see it.

¶ 16       In response to defendant's motion for summary judgment, plaintiff argued that defendant was not entitled to discretionary immunity where defendant's employees had no discretion "in the preparation of the roadway for the eventual paving." She claimed a question of fact existed as to whether defendant undertook the repairs in a reasonably safe manner. Plaintiff argued defendant had decided to excavate the portion of the roadway at issue in June, knowing it would not be paved for several months and, in the meantime, left the area open to traffic even though it could degrade and the evidence showed the area at issue was degraded at the time of her accident where it was "significantly below street grade" and consisted of loose gravel and other material.

¶ 17       In support of her response to defendant's motion for summary judgment, plaintiff attached the deposition transcript of Carlton. In her deposition, Carlton testified that she had witnessed plaintiff's motorcycle accident on July 23, 2016, which occurred as Carlton was driving home and traveling northbound on North 5th Avenue. Plaintiff was traveling southbound in the middle of a single file line with two other motorcycles. Carlton pulled over on the right shoulder of the northbound lane and stopped her vehicle at some point prior to the gravel area at issue because had seen the three motorcyclists approaching the gravel area in the opposite lane and thought it would be safer to pull to the side. Carlton lived on the west side of the road and had pulled over to the righthand side (the east side) of the northbound lane so the motorcycles could pass before she turned into her driveway. Carlton testified that she was specifically watching plaintiff (and not the first motorcyclist) because plaintiff had driven through a prior gravel area in the road and Carlton was wondering whether plaintiff would travel through the second gravel area (the area at issue) or go around it. Carlton testified, "[s]he went right through

9

it." Carlton indicated that as plaintiff entered the gravel area, plaintiff's front wheel turned to the east and plaintiff's motorcycle dropped. Carlton did not know what had caused plaintiff's wheel to turn or why plaintiff had lost control of her motorcycle. There had been nothing to obstruct plaintiff's view of the road.

¶ 18     Carlton additionally testified that after the area at issue had been excavated and filled with gravel in June and before it was paved in October, she drove over the area when leaving her driveway and did not recall bumping down into the area or bouncing up from it. Prior to the area being excavated and filled with gravel, Carlton had complained to the Village about the condition of that area of the roadway. Carlton felt that prior to the area being excavated, the condition of the road (crumbled pavement) was hazardous.

¶ 19     In reply, defendant argued that the evidence demonstrated that defendant's decision regarding which repairs were to be done was discretionary and was made in consideration of the Village's resources and safety issues. Defendant also argued there had been no evidence that the portion of the roadway at issue was unsafe at the time of plaintiff's motorcycle accident and there had been no evidence that the gravel area at issue was "significantly below" street grade at the time of the accident. Defendant also argued that there had been no evidence indicating the gravel section of the roadway caused plaintiff to crash her motorcycle where plaintiff had no memory of the accident and Carlton, who was the sole eyewitness, testified she did not know what had caused plaintiff to lose control of the motorcycle.

¶ 20     At the hearing on defendant's motion for summary judgment, the trial court indicated that the evidence showed defendant's decisions to repair the roadway were "conscious decisions," resulting from an inspection or complaints about certain areas of roadway in disrepair. The method of repair was always done the same way, and there were no allegations or evidence that

10

defendant's method of repair was defective. The trial court further indicated, "[e]very step of this was conscious, discretionary decisions by [defendant]." The trial court noted that, arguably, the only part of the process that was not discretionary was, once defendant had identified a location to be repaired, "they did [the repair work] the same way every time." The trial court also noted there was no evidence indicating that the manner in which defendant had done the work, which was "sort of nondiscretionary and ministerial," was negligent or that it had caused a hazard.

¶ 21 Plaintiff filed a motion to reconsider, arguing that the trial court misapplied the law on all three issues raised by defendant—statutory immunity, the open and obvious doctrine, and proximate cause. After the hearing on the motion, the trial court indicated that defendant decisions in regard to when and where to do road repairs was "all discretionary." The trial court acknowledged plaintiff's argument that once defendant chose to repair a portion of the road, defendant had duty to do it in a reasonably safe manner. The trial noted there was no evidence supporting plaintiff's contention that the excavated area was significantly below street grade at the time of the accident and, even with reviewing the photographs, there was no indication that the repair work had not been completed in a reasonable safe manner. The trial court further indicated that even though there had been evidence indicating an excavated/graveled/compacted area could degrade, there was no evidence that the area of roadway at issue had, in fact, degraded. For those reasons, the trial court denied plaintiff's motion to reconsider.

¶ 22 Plaintiff appealed.

¶ 23                                                  II. ANALYSIS

¶ 24 On appeal, plaintiff argues the trial court erred by granting defendant's motion for summary judgment and by denying her motion to reconsider because: (1) defendant was not entitled to discretionary immunity under the Tort Immunity Act because there was no evidence

11

defendant's employees had discretion in preparing area of roadway at issue for eventual paving, and the evidence showed it could degrade and was significantly below street grade at the time of the accident and, thus, a question of fact remains as to whether defendant undertook those repairs in a reasonably safe manner; (2) defendant had reason to anticipate or expect that a reasonable person in plaintiff's position would deliberately encounter the open and obvious danger of the condition of the roadway at issue; and (3) a material issue of fact remained as to the proximate cause of plaintiff's motorcycle crash where a reasonable inference could be drawn that the road condition at issue was a proximate cause. In response, defendant argues the trial court correctly granted its motion for summary judgment on discretionary immunity grounds. In addition, defendant contends that the condition of the portion of the road at issue was open and obvious (with no applicable exception to the open and obvious doctrine) and there was no evidence that the condition of the area of the road at issue was a proximate cause of plaintiff's negligence claim.

¶ 25    A party is entitled to summary judgment where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). In reviewing a trial court's order granting summary judgment, we must determine whether a genuine issue of material fact existed to precluded summary judgment or, absent such an issue of fact, whether summary judgment was proper as a matter of law. *Andrews v. Metropolitan Water Reclamation District of Greater Chicago*, 2019 IL 124283, ¶ 20. We review a trial court's order granting summary judgment *de novo*. *Id.* ¶ 21.

¶ 26    Under the Tort Immunity Act, "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109

12

(West 2016). Section 2-201 of the Tort Immunity Act provides, "[e]xcept as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (West 2016). Taken together, sections 2-109 and 2-201 of the Tort Immunity Act shield a municipality from liability for discretionary acts or omission by its employees. *Andrews*, 2019 IL 124283, ¶ 26. Discretionary immunity for public officials stems from the idea that public officials should be allowed to exercise their judgment in making decisions without fear that a good-faith mistake might subject them to liability. *Id.*

¶ 27     A local public entity is entitled to immunity for the discretionary acts of its employee pursuant section 2-201 of the Tort Immunity Act if: "(1) the employee held either a position involving the determination of policy *or* a position involving the exercise of discretion; and (2) the employee engaged in *both* the determination of policy *and* the exercise of discretion when performing the act or omission from which the plaintiff's injury resulted." (Emphases in original). *Id.* ¶ 27. Policy determinations are decisions that require the public entity or employee to balance competing interests and make a judgment call as to what solutions will best serve each interest. *Id.* ¶ 28. Such competing interests may include safety, convenience, and cost. *Id.* Discretionary acts are those acts that involve the exercise of personal deliberation and judgment when deciding whether a particular act should be performed or in deciding how and in what manner that act should be performed. *Id.*

¶ 28     In contrast, the negligent performance of ministerial tasks is not protected by immunity under the Tort Immunity Act. *Monson v. City of Danville*, 2018 IL 122486, ¶ 30. While a discretionary act requires the exercise of judgment, ministerial acts are performed in a prescribed

13

manner, in obedience to the mandate of legal authority, without regard to an official's exercise of discretion as to the propriety of the acts being done. *Id.* A municipality exercises its discretion when selecting and adopting a plan to make public improvements but, in general, will act ministerially in carrying out the plan and is bound to see that the work is done in a reasonably safe and skillful manner. *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 194 (1997).

¶ 29　　　　Determining whether an injury resulted from a discretionary act or omission should be determined based on the particular facts and circumstances of each case. *Andrews*, 2019 IL 124283, ¶ 28. The governmental entity claiming immunity under the Tort Immunity Act as an affirmative defense bears the burden of properly raising and proving the immunity. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 370 (2003). The entity claiming immunity must have "made an actual decision with respect to the acts or omissions giving rise to the injuries." *Andrews*, 2019 IL 124283, ¶ 37. An "omission" in the context of section 2-201 must be construed as "an affirmative decision to take no action" under the circumstances. *Id*.

¶ 30　　　　Here, there is no dispute that Olson's position involved the determination of policy or an exercise of discretion. See 745 ILCS 10/2-109 (West 2016). However, the evidence indicates that Olson exercised his discretion in determining that the section of the roadway at issue was to be excavated, filled with gravel, and rolled in June in preparation for eventual paving in October. He testified the area was alligatored and was lifting, which was a hazard. Additionally, defendant had made a "conscious decision" to refrain from paving the graveled area and having that portion of roadway remain open to traffic, until it could be paved a few months later when defendant's contractor did its annual paving work. Defendant's "conscious decision" for the gravel section at issue to remain unpaved until October was based on economic and safety reasons in that it was more cost-effective to have multiple areas paved at the same time and the area at issue was safer

14

after it was prepared for eventual patching than it would have been if left in the original state of disrepair. Thus, defendant's conscious decision to prepare the area at issue for paving in June but refrain from having the area paved until months later was an exercise of discretion. See *Andrews*, ¶ 34 ("a municipal defendant asserting immunity under section 2-201 must present evidence of a 'conscious decision' by its employee pertaining to the conduct alleged to have caused the plaintiff's injuries"). Additionally, defendant's contemplation of, and determination regarding, the Village's funds and resources demonstrates defendant engaged in a policy determination. See *Doyle*, 2018 IL App (1st) 170357, ¶ 45 ("deciding how best to spend limited resources is a policy determination"). Because defendant was immune from liability, we need not address plaintiff's additional arguments.

¶ 31    We acknowledge plaintiff's argument that the Public Works Department's roadcrew employees adhered to a "set process" in preparing the area at issue for eventual paving and, thus, the performance of that work was ministerial rather than discretionary. We agree that no evidence was presented indicating the roadcrew had any discretion when performing that work, and it was defendant's burden to prove discretionary immunity regarding that "set process" (excavating the area, filling the area in with gravel, and rolling it to compact the area). See *Van Meter*, 207 Ill. 2d at 370 (2003); *cf. Wrobel v. City of Chicago*, 318 Ill. App. 3d 390, 396 (2000) (finding the acts complained of by plaintiff were not ministerial where workers had discretion in determining how much asphalt and moisture to remove from the pothole and the amount removed was left to "the personal judgment of the workers"). Nonetheless, regardless of whether the actions of defendant's roadcrew in preforming that "set process" were discretionary or ministerial, there was no indication the work had not been completed in a reasonably safe and skillful manner. See *Chicago Flood*, 176 Ill. 2d at 194; *Wrobel*, 318 Ill. App. 3d at 397 (although

15

plaintiffs, as nonmovants, were not required to prove their case at the summary judgment stage, they had a burden to present some factual basis that would arguably entitle them to a judgment). Even considering the referenced photographs of the area at issue (taken days after the accident), there was no evidence that the excavated/gravel area was "significantly below" street grade at the time of the accident, as plaintiff contended. Also, plaintiff could not recall anything that happened in the hours leading up to or at the time of the accident, including where she was looking at the time of the crash. Even Carlton, the sole eyewitness, testified that she did not know what had caused plaintiff to crash. Additionally, Olson had testified that the gravel area at issue did not consist of loose gravel and, instead, had been compacted and was just as hard as the surrounding pavement, with it being safe for a motorcyclist to drive over. Thus, there was no indication that the area at issue was not reasonably safe at the time of plaintiff's motorcycle crash. See *In re Estate of Frakes*, 2020 IL App (3d) 180649, ¶ 16 ("[u]nsupported conclusions, opinions, or speculation are insufficient to raise a genuine issue of material fact").

¶ 32    Consequently, defendant was entitled to discretionary immunity from liability pursuant to the Tort Immunity Act. See 745 ILCS 10/2-109, 2-201 (West 2016). We, therefore, affirm the trial court's grant of defendant's motion for summary judgment.

¶ 33                                   III. CONCLUSION

¶ 34    The judgment of the circuit court of Grundy County is affirmed.

¶ 35    Affirmed.