# Illinois Official Reports

## Appellate Court

---

### *Doyle v. Village of Tinley Park*, 2018 IL App (1st) 170357

---

| | |
|---|---|
| Appellate Court Caption | PATRICIA DOYLE and BRIAN DOYLE, Plaintiffs-Appellants, v. THE VILLAGE OF TINLEY PARK and MALONE & MOLONEY, INC., Defendants-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-17-0357 |
| Filed | September 28, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-13684; the Hon. Eileen O'Neill Burke and the Hon. James E. Snyder, Judges, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Peter G. Hallam and Jonathan R. Koyn, of Flossmoor, for appellants.<br><br>Michael R. Hartigan, of Hartigan & O'Connor P.C., of Chicago, for appellee Village of Tinley Park.<br><br>James E. DeBruyn, of DeBruyn, Taylor & DeBruyn Ltd., of Orland Park, for other appellee. |

PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.

Justices Pucinski and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiffs Patricia and Brian Doyle purchased a home in a Tinley Park subdivision in 2004. Several years later, the Doyles began to experience drainage problems on their property which allegedly caused structural damage to the home. The Doyles brought a negligence suit against the developer of the subdivision, Malone & Moloney, Inc. (Malone),[1] and the Village of Tinley Park. The Doyles alleged that Malone failed to install a properly working storm drain system, in breach of an annexation agreement entered into by Malone and the village in 1990. The Doyles further alleged that the damage was exacerbated by the village's delay in addressing the drainage problem.

¶ 2     The trial court dismissed the claims against Malone, finding that the Doyles lacked standing to sue under the annexation agreement either as successor owners of the property or as third-party beneficiaries. The trial court also granted summary judgment to the village, finding that it was immune from suit under section 2-201 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/2-201 (West 2012)), which immunizes public employees "serving in a position involving the determination of policy or the exercise of discretion" for their actions "in determining policy when acting in the exercise of such discretion." The Doyles now appeal. We agree with the trial court and affirm.

¶ 3                                   BACKGROUND

¶ 4     Malone is the developer of the Brookside Glen subdivision in Tinley Park. On January 11, 1990, Malone entered into an annexation agreement with the village regarding development of the subdivision. The agreement defines the property subject to the agreement as follows:

> "The Subject Property is generally bounded on the north by 191st Street, on the east by Harlem Avenue, on the west generally by 88th Avenue but extending as far west as 92nd Avenue, and on the south by several different housing developments. The Subject Property contains approximately 828 acres and is contiguous with the Village of Tinley Park."

In relevant part, Malone agreed to design and construct storm sewers so that the subdivision's storm water runoff would be retained within a central detention system.

¶ 5     In 2004, the Doyles contracted with Malone to build a residence at 7606 Bayfield Drive in the Brookside Glen subdivision. The contract contained a limited warranty providing that Malone would fix any defects due to faulty construction brought to its attention within a year

---

[1]Although the complaint in this case listed the company as "Malone & Maloney, Inc.," the company's entry of appearance in this case corrects that spelling to "Malone & Moloney, Inc."

from the date of closing. The sale closed on May 30, 2004, and the Doyles have lived at the house since its completion.

¶ 6      Sometime in 2007 or 2008, the Doyles began to notice a problem with their sump pump: during times of rain or heavy snow, they could hear it ejecting water every few seconds, at a higher rate than their neighbors' pumps. Although the Doyles never had water in their basement, they were concerned as to why their pump was overactive. The pump stopped working in July 2008, and the Doyles replaced it, but the issue persisted.

¶ 7      Patricia Doyle first contacted the village about the problem in fall 2009, via a phone call to the Department of Public Works. She was told to have a plumber check the sump pump and sprinkler system for leaks. After two plumbers found no leaks, the Doyles filed a drainage complaint with the village on March 23, 2010. At this time, the Doyles had not yet observed any structural damage to their home, but there was serious erosion around the storm drain on the west side of the house: the surrounding dirt had caved in, and the ground in the area had dropped by several feet.

¶ 8      On April 9, 2010, a public works crew was dispatched to the Doyles' house. The crew placed stone, soil, and grass seed around the storm drain in the area of the cave-in but did not take further measures to remedy the cause of the sinkhole. The crew was sent at the direction of Mary Dobyns, a foreman for the village's Streets Department. Dobyns later explained that although she assigns crews to jobs, what they do "is their call once they get there." If a crew believes that a problem is beyond its expertise, it is supposed to call Dobyns. The April 9 crew did not call her.

¶ 9      Over the next several months, Patricia called the Department of Public Works several more times to inform them that their sump pump was "not shutting off during rain." By September 30, 2010, Patricia observed that the rim of the storm drain was collapsing, and all of the soil and rock added in April had fallen into the bottom of the drain. She called the Department of Public Works again, stating that the sinkhole on her property was dangerous and that additional work needed to be done. She was told that Dobyns was on medical leave, but a work order would be submitted for the property. On November 15, 2010, a second work crew came to the house. Patricia observed them placing more stone around the storm drain as they did in April.

¶ 10      Around December 2010, the Doyles first noticed structural damage to their home: the floor was slanted on the ground level and in the basement, and the support beams in the basement were, in Patricia's words, "heaving up."

¶ 11      On February 18, 2011, Patricia sent an e-mail regarding the damage to Kelly Borak, the superintendent of the Streets Department. In response, the village sent a third work crew on March 2, 2011. The crew performed a dye test by pouring dye into the storm drain. Within 20 to 30 minutes, the dye appeared in the Doyles' sump pump pit, evidencing that the storm pipe was leaking water. The next day, March 3, the work crew returned to the house and performed a camera test by sending a robot with a camera attachment into the storm drain. The camera footage confirmed that the pipe was compromised in several locations.

¶ 12      Later that day, Patricia e-mailed Borak to discuss these findings. Borak apologized to Patricia for how long it took to identify the cause of the drainage problem, saying, "[T]he list of drainage complaints is more than we can accommodate and we do not have the manpower to complete the drainage complaints in a timely manner." She assured Patricia that the village was working with the board of trustees to remedy the problem.

- 3 -

¶ 13        After discussing the matter with Dobyns, Borak determined that the village could not fix the damaged pipe on its own. Dobyns was in charge of soliciting bids from contractors. On March 31, 2011, a contractor hired by the village installed a sleeve into the storm pipe on the west side of the Doyles' property to repair the leak. After installing the sleeve, the contractor dumped excess water into the storm drain down the street and then left. Minutes later, Patricia heard her sump pump starting to operate. She called the Department of Public Works and told them that the problem was not fixed.

¶ 14        Further tests by the village on April 11 and 12 showed that the storm pipe under the street—a different pipe than was repaired on March 31—was also leaking. In an e-mail on April 25, Borak advised Patricia: "I have been collecting prices to repair the storm pipe in the street. After we have 3 comparable quotes then it must be presented to the Village Manager for approval. This will take some time."

¶ 15        On May 2, 2011, Patricia sent an e-mail to Mayor Zabrocki expressing frustration that the problem had not yet been fixed. In response, several village officials, including Trustee Thomas Staunton, came to the Doyles' house on July 1 to view the damage and discuss solutions. According to Patricia, Staunton said that the village would not repair the storm pipe under the street because it was "insignificant and not worth [the village's] while." He also told the Doyles, "Go ahead and sue us. Tinley Park has no money and we are protected by tort immunity."

¶ 16        Notwithstanding Staunton's words, the village hired a second contractor to repair the storm pipe under the street on July 27, 2011. This repair was more extensive than the March 31 repair in that it involved removal and replacement of the pipe. After this repair, the Doyles experienced no further problems with their sump pump.

¶ 17        The Doyles filed suit against Malone and the village on December 27, 2011, seeking compensation for the damage to their property. In count V of their third amended complaint, the Doyles alleged that Malone breached its 2004 contract with them by failing to build their residence "in a good workmanlike manner." In counts III and IV, the Doyles alleged that Malone breached its duty to install a sewage system that was adequate to properly drain water from properties in the subdivision, in violation of the 1990 annexation agreement between Malone and the village. The Doyles argued that they had standing to enforce the annexation agreement based upon the agreement's successor liability clause, which provided:

        "This Agreement shall be binding upon and inure to the benefit of the parties hereto, successor owners of record of the Subject Property, assignees, lessees and upon any successor municipal authorities of said Village and successor municipalities ***."

The Doyles claimed that they could enforce the agreement as successor owners of a residence in the Brookside Glen subdivision. Alternately, the Doyles argued that they were third-party beneficiaries of the agreement.[2]

¶ 18        As for the village, the Doyles alleged that the damage to their home was exacerbated by the village's failure to deal with the drainage problem in a timely or appropriate manner. The Doyles filed their drainage complaint with the village on March 23, 2010. Although work crews visited the house on April 9 and November 15, they merely filled in the sinkhole

_____

[2]The Doyles also raised various other claims against Malone that are not relevant to this appeal.

without attempting to ascertain its cause. By April 12, 2011, the village was aware that the storm pipe under the street was compromised, but it did not fix the pipe until July 27.

¶ 19    The Doyles alleged that, due to defendants' negligence, large quantities of water accumulated beneath the base slab of their house, cracking the slab, pushing up the columns, and causing other structural damage. The water also created a dangerous sinkhole on the property. The Doyles alleged that their property was not salable in its damaged condition.

¶ 20    Malone moved to dismiss counts III and IV pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2012)), arguing that the Doyles lacked standing to sue under the annexation agreement. The trial court granted Malone's motion on September 9, 2015, finding that, although the annexation agreement provided for successor liability, the Doyles were successors to Malone and not the village, so they could not sue Malone for its alleged breach of the agreement. The court also held there was no evidence that subsequent purchasers of homes, such as the Doyles, were intended third-party beneficiaries of the annexation agreement.

¶ 21    Malone then moved for summary judgment on count V, arguing that (i) the defective storm pipes that damaged the Doyles' house were beyond the scope of the 2004 contract between Malone and the Doyles; (ii) there was no evidence that Malone's construction of the house was faulty; and (iii) in any event, the Doyles did not notice any damage to their residence until well after the expiration of the one-year warranty. The trial court granted Malone's motion for summary judgment, finding that the Doyles' allegations of faulty construction were "conclusory in nature."

¶ 22    The village also moved for summary judgment, arguing that it was entitled to discretionary tort immunity under section 2-201 of the Tort Immunity Act (745 ILCS 10/2-201 (West 2012)) because the means and methods by which its employees address drainage complaints from residents involve the exercise of discretion. The trial court initially denied the village's motion, finding that whether the village's acts were ministerial or discretionary was a question of fact. The village moved for reconsideration, and on September 14, 2016, the trial court granted the motion and entered summary judgment for the village "for reasons stated on the record."

¶ 23    The Doyles now appeal (i) the trial court's dismissal of counts III and IV against Malone and (ii) the court's grant of summary judgment for the village.

¶ 24                                                    ANALYSIS
¶ 25                              Standing to Sue to Enforce the Annexation Agreement
¶ 26    As discussed, the Doyles' claims against Malone in this appeal are premised on Malone's alleged breach of the annexation agreement that Malone and the village executed in 1990. The Doyles argue that they had standing to bring such an action, both as successor owners of the property and as intended third-party beneficiaries of the contract. We consider these claims in turn, accepting as true all well-pleaded facts in the complaint and construing the pleadings in the light most favorable to the Doyles, as is appropriate in reviewing a section 2-619 dismissal. *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55.

¶ 27    Initially, we observe that the Doyles do not appeal the trial court's grant of summary judgment on count V, regarding their 2004 contract with Malone. Nor would any such appeal be meritorious. As the trial court found, there was no evidence that Malone's construction of

the Doyles' house was faulty. Rather, the evidence showed that the Doyles' house was damaged by faulty storm drains, which were outside the scope of the 2004 contract. Thus, the Doyles' claims depend on their ability to enforce Malone's obligations under the annexation agreement.

¶ 28    By definition, an annexation agreement is a contract between a municipality and an owner of land in unincorporated territory. 65 ILCS 5/11-15.1-1 (West 2012). The contract annexes the land to the municipality, thereby subjecting it to the municipality's ordinances, control, and jurisdiction. *Id.* § 11-15.1-2. The Illinois Municipal Code provides that any annexation agreement "shall be binding upon the successor owners of record of the land which is the subject of the agreement and upon successor municipal authorities of the municipality and successor municipalities. Any party to such agreement may by civil action *** enforce and compel performance of the agreement." *Id.* § 11-15.1-4. Additionally, the agreement itself provides for successor liability in section 16, "Binding Effect and Term and Covenants Running with the Land." That section provides, in relevant part: "This Agreement shall be binding upon and inure to the benefit of the parties hereto, successor owners of record of the Subject Property, assignees, lessees and upon any successor municipal authorities of said Village and successor municipalities."

¶ 29    The Doyles argue that they, as purchasers of an individual lot within the Brookside Glen subdivision, are "successor owners of record" of the subdivision, under both the 1990 annexation agreement and section 11-15.1-4 of the Illinois Municipal Code (*id.*). This assertion underlies both their claim to successor liability and their third-party beneficiary claim.

¶ 30    We disagree with this fundamental assertion. In interpreting the annexation agreement, our primary goal is to effectuate the parties' intent by interpreting the contract as a whole. *Joyce v. DLA Piper Rudnick Gray Cary LLP*, 382 Ill. App. 3d 632, 636-37 (2008). Moreover, we will construe the contract reasonably to avoid absurd results. *Suburban Auto Rebuilders, Inc. v. Associated Tile Dealers Warehouse, Inc.*, 388 Ill. App. 3d 81, 92 (2009). Initially, we do not find that the wording of the annexation agreement supports the Doyles' construction. The agreement defines the "Subject Property" as an 828-acre parcel of land contiguous with the village—*i.e.*, the entire subdivision. If the drafters of the agreement intended to confer successor status upon each and every purchaser of a lot within the subdivision (as opposed to, say, a developer who purchased the entire subdivision property from Malone), the agreement would have said "successor owners of record of the Subject Property *or any portion thereof.*"

¶ 31    Likewise, the statute refers to "successor owners of record of the land which is the subject of the agreement" (65 ILCS 5/11-15.1-4 (West 2012)) but makes no reference to those who purchase only a small portion of that land. The Doyles do not cite any cases where homeowners who purchase a single lot from a larger annexed territory are considered "successor owners of record" under the statute, nor does our research disclose any.

¶ 32    Moreover, if we adopted the Doyles' interpretation of the annexation agreement and the statute, then each and every homeowner in the subdivision would succeed to Malone's interest in the property. *Humphrey Property Group, L.L.C. v. Village of Frankfort*, 392 Ill. App. 3d 611, 614 (2009) (with respect to an annexation agreement, a successive purchaser of land stands in the place of the original landowner who made the contract with the municipality). As successors, the homeowners would stand in Malone's shoes and be bound to Malone's obligations—and, as a result, the village could sue the Doyles, or any other

homeowners in the subdivision, for failing to properly design and construct storm sewers in accordance with the annexation agreement. See *Village of Orland Park v. First Federal Savings & Loan Ass'n of Chicago*, 135 Ill. App. 3d 520, 526 (1985) (because annexation agreement was binding upon successor owner of property, village could sue successor owner to enforce its provisions). We decline to find that either the parties to the contract or the legislature intended such an absurd result. Accordingly, we find that the Doyles lack standing to bring an action against Malone as successor owners of the property.[3]

¶ 33    Because the Doyles cannot be considered "successor owners of record" of the subject property, their third-party beneficiary argument fails as well. Under Illinois law, not every third party who benefits from a contract can sue for its breach. *Carlson v. Rehabilitation Institute of Chicago*, 2016 IL App (1st) 143853, ¶ 14. Third parties have rights under a contract only if they are intended beneficiaries; that is, the contracting parties must have intended to directly benefit the third parties by the performance of the contract. *Id.*; *F.H. Paschen/S.N. Nielsen, Inc. v. Burnham Station, L.L.C.*, 372 Ill. App. 3d 89, 96 (2007). By contrast, an incidental beneficiary has no rights under a contract and lacks standing to sue to enforce its terms. *Carlson*, 2016 IL App (1st) 143853, ¶¶ 14-15. In determining whether a third-party beneficiary is intended or incidental, courts consider the language of the contract and the circumstances surrounding its execution. *Id.* ¶ 14. Because parties typically enter into contracts to benefit themselves rather than third parties, there is a presumption against intended beneficiary status that "can only be overcome by an implication so strong as to be practically an express declaration." *Estate of Willis v. Kiferbaum Construction Corp.*, 357 Ill. App. 3d 1002, 1008 (2005); see also *Carlson*, 2016 IL App (1st) 143853, ¶ 16.

¶ 34    No such implication is present in the annexation agreement. As discussed, individual homeowners such as the Doyles are not "successor owners of record of the Subject Property" within the meaning of the annexation agreement. Thus, there is no expressed intent to benefit such individual homeowners. Although there is no question that the parties were aware that the storm drainage system would benefit homeowners, this is insufficient under Illinois law to afford homeowners intended third-party beneficiary status. See *Altevogt v. Brinkoetter*, 85 Ill. 2d 44, 56 (1981) (builder's knowledge that a third party would occupy the house did not establish that occupants were intended beneficiaries); *155 Harbor Drive Condominium Ass'n v. Harbor Point Inc.*, 209 Ill. App. 3d 631, 647 (1991) (individual unit owners were not intended beneficiaries of construction contracts even though "[t]here is no question that the parties *** were aware that the building was being built for subsequent purchasers").

¶ 35    Accordingly, we affirm the trial court's dismissal of counts III and IV of the Doyles' complaint.

¶ 36                                    Tort Immunity

¶ 37    The Doyles next argue that the trial court erred in granting summary judgment to the village on the basis of discretionary tort immunity. We review the grant of summary judgment *de novo* (*Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008)), keeping in mind

_____

[3]We additionally observe that even if the Doyles could be considered successor owners of the property, they would succeed to Malone's interest in the annexation agreement, not to the village's. See *Humphrey Property Group*, 392 Ill. App. 3d at 614. As such, the Doyles could not sue Malone (in whose shoes they would be standing) for breach of the annexation agreement.

that summary judgment is appropriate only where "there is no genuine issue as to any material fact and *** the moving party is entitled to a judgment as a matter of law" (735 ILCS 5/2-1005(c) (West 2016)). In order to prevail, the nonmoving parties must present some evidence that would arguably entitle them to recover at trial. *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 472 (2010).

¶ 38    Section 2-201 of the Tort Immunity Act provides: "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (West 2012). For an employee to enjoy immunity under this section, the employee's allegedly tortious action must result from both "the determination of policy" and "the exercise of discretion." *Id.*; see *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 341 (1998); *Albers v. Breen*, 346 Ill. App. 3d 799, 808 (2004). The Doyles argue that the village's failure to remedy the sinkhole in a timely manner did not meet either of these criteria.

¶ 39    For purposes of section 2-201, policy determinations are decisions that require a governmental employee " 'to balance competing interests and to make a judgment call as to what solution will best serve each of those interests.' " *Harinek*, 181 Ill. 2d at 342 (quoting *West v. Kirkham*, 147 Ill. 2d 1, 11 (1992)). Discretionary acts "involve the exercise of personal deliberation and judgment in deciding whether to perform a particular act, or how and in what manner that act should be performed." *Wrobel v. City of Chicago*, 318 Ill. App. 3d 390, 395 (2000). By contrast, ministerial acts (which do not enjoy immunity) are performed in a prescribed manner without reference to the official's discretion. *Id.* at 396; see also *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 194 (1997) (ministerial acts are "absolute, certain and imperative, involving merely the execution of a set task" (internal quotation marks omitted)).

¶ 40    The Doyles concede that the village's initial decision to repair the sinkhole, made in response to the Doyles' drainage complaint on March 23, 2010, was both an exercise of discretion and a determination of policy. But they argue that all of the village's actions thereafter were "merely the execution of a set task" (internal quotation marks omitted) (*Chicago Flood Litigation*, 176 Ill. 2d at 194) and not entitled to immunity. We disagree.

¶ 41    The record shows that the village sent work crews to the Doyles' house on April 9, 2010, and on November 15, 2010. On both of those occasions, the crew placed stone and soil around the storm drain but, according to Patricia, did not test the integrity of the storm pipes by conducting a dye test or a camera test. These remedial measures were discretionary in nature: Dobyns explained that the workers' actions to address the problem were "their call once they get there." Here, the workers decided that it was sufficient to fill in the sinkhole. The Doyles argue that they should have performed tests to determine the cause of the problem. But by criticizing the workers' judgment—effectively arguing that they made the "wrong call"—the Doyles inadvertently highlight the discretionary nature of the remedial actions.

¶ 42    In this regard, this case is analogous to *Wrobel*, 318 Ill. App. 3d 390, in which the court held that city workers' conduct in repairing potholes involved the exercise of discretion. A driver struck a pothole, lost control of his vehicle, and veered into traffic, injuring plaintiffs. Plaintiffs sued the city for negligent maintenance of the road. It was undisputed that four

days before the accident, city workers had repaired potholes on that block. *Wrobel* held that the city was immune from suit. The court explained that workers repairing potholes "enjoy discretion in determining how much asphalt and moisture should be actually extracted [from each pothole] and whether that amount is indeed adequate to ensure a durable patch." *Id.* at 395. Likewise, the record in this case shows that the work crews sent to the Doyles' house had discretion in determining how best to deal with the drainage problem.

¶ 43     In response to the Doyles' continued concerns, the village sent a third work crew to their house on March 2 and 3, 2011, and testing determined that the storm pipe on their property was leaking in several locations. The record shows that fixing the pipe was not "merely the execution of a set task" (internal quotation marks omitted) (*Chicago Flood Litigation*, 176 Ill. 2d at 194), but required "the exercise of personal deliberation and judgment" (*Wrobel*, 318 Ill. App. 3d at 395) by village officials. Borak discussed the problem with Dobyns and determined that the village did not have the resources to fix the pipe on its own. Dobyns then began the process of soliciting bids from outside contractors. Eventually a contractor was hired to fix the pipe on the Doyles' property—but it was discovered that the pipe under the street was also leaking, necessitating a new round of decisionmaking and bidding from contractors. Borak stated as much in her April 25, 2011, e-mail to Patricia: "I have been collecting prices to repair the storm pipe in the street. After we have 3 comparable quotes then it must be presented to the Village Manager for approval. This will take some time."

¶ 44     We find that the village employed discretion at every step of the repair process, from the first work crew that visited the Doyles' house and had to decide what to do about the sinkhole, to the village manager who decided to approve the street pipe repair.

¶ 45     Moreover, the record demonstrates that village officials were engaged in ongoing policy determinations regarding the allocation of village funds and resources. In an e-mail to Patricia, Borak stated, "[T]he list of drainage complaints is more than we can accommodate and we do not have the manpower to complete the drainage complaints in a timely manner." In a similar vein, Staunton, one of the village's trustees, told the Doyles that the village "has no money" and opined that fixing the leaking street pipe was "not worth [the village's] while." It is well established that deciding how best to spend limited resources is a policy determination.

¶ 46     For instance, in *Nichols v. City of Chicago Heights*, 2015 IL App (1st) 122994, plaintiffs' homes were damaged in flooding during a two-day rainstorm. They sued the city, alleging operational negligence of the storm sewer system. *Nichols* held that immunity applied to the city's decisions regarding the maintenance and improvement of its sewer system. *Id.* ¶ 33. Evidence showed that the city had an ongoing sewer rehabilitation program, including dye testing of " 'high priority' " locations and discussion of cost-effective solutions to stay within budgetary constraints. *Id.* ¶¶ 34-38. The court concluded that "the mayor and the City were balancing competing interests and making continued and ongoing judgment calls as to what set of action would best serve those competing interests"—*i.e.*, they were both exercising discretion and determining policy. *Id.* ¶ 39. The court further stated:

> "We understand plaintiffs' frustration that their homes were flooded with waste and we, like the trial court below, recognize that this flooding may have been avoided had the City's sewers been better maintained. However, a municipality must function while balancing many interests, including a limited budget. Here, the City had a plan and was moving forward on that plan, balancing, as a municipality must, many

interests. Even if its conduct were negligent, we would still find that it was immune from suit under section 2-201." *Id.* ¶ 41.

Likewise, we are not unsympathetic to the Doyles' frustration regarding the length of time it took to fix the drainage problem and the resultant damage to their home. But village officials exercised their judgment in utilizing the village's limited manpower and budget, and, as a result, their actions are immune from liability.

¶ 47       The Doyles nevertheless argue that the present case is analogous to *Gutstein v. City of Evanston*, 402 Ill. App. 3d 610 (2010), in which the city's failure to perform scheduled repairs was held to be ministerial rather than discretionary. Gutstein tripped and fell in an unpaved alley abutting her property. *Id.* at 612. She sued the city for negligent maintenance of the alley. The city's policy was to annually regrade each of its unpaved alleys, but there was no evidence the city did *any* work in the alley before Gutstein's fall. *Id.* at 612, 626. Under these facts, *Gutstein* held that discretionary tort immunity did not apply. The court explained that the city's decision to implement a program of repairs (the annual regrading of alleys) involved the exercise of discretion, but once the program was implemented, carrying out that program was a ministerial act, in that it was " 'absolute, certain and imperative, involving merely the execution of a set task.' " *Id.* at 625 (quoting *Chicago Flood Litigation*, 176 Ill. 2d at 194). The court also distinguished *Wrobel*, since there was no evidence that the regrading process required any "complex, location-specific determinations," unlike the pothole repair process in *Wrobel*. *Id.* at 627.

¶ 48       *Gutstein* is readily distinguishable. Unlike the city in *Gutstein*, which failed to perform *any* repairs on the alley in question, the village engaged in extensive repair efforts that involved many complex determinations and did eventually solve the Doyles' drainage problem. The Doyles criticize the *manner* in which these repair efforts were conducted, but, as discussed, deciding how to perform the repairs involved both the exercise of discretion and the determination of policy, and the village is therefore immune from suit under section 2-201.

¶ 49                                    CONCLUSION

¶ 50       Because the Doyles lacked standing to enforce the annexation agreement between Malone and the village, we affirm the trial court's dismissal of counts III and IV against Malone. We also affirm the trial court's grant of summary judgment for the village on grounds of discretionary tort immunity.

¶ 51       Affirmed.