2023 IL App (1st) 221953-U

FIRST DISTRICT,
FIRST DIVISION
December 18, 2023

Nos. 1-22-1953 & 1-23-0062

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| STUART L. PINKERT, | ) | |
| | ) | |
|     Plaintiff-Counterdefendant-Appellee, | ) | |
| v. | ) | |
| | ) | |
| BOARDWALK BIRCH COMPANIES, LLC – | ) | Appeal from the |
| SERIES P and ARTHUR HOLMER, | ) | Circuit Court of |
| | ) | Cook County, Illinois. |
|     Defendants-Counterplaintiffs-Appellants. | ) | |
| _____ | ) | Nos. 2019 L 11514, |
| | ) | 2019 L 13730 |
| STUART L. PINKERT, individually and as trustee for | ) | |
| the STUART L. PINKERT CHILDRENS TRUST, | ) | Honorable |
| | ) | Patrick J. Sherlock, |
|     Plaintiff-Counterdefendant-Appellee, | ) | Judge Presiding. |
| v. | ) | |
| | ) | |
| WELLS STREET EQUITIES, LLC, | ) | |
| | ) | |
|     Defendant-Counterplaintiff-Appellant. | ) | |

_____

    JUSTICE COGHLAN delivered the judgment of the court.
    Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1     *Held*:   In consolidated breach of contract actions, (1) defendant commercial real estate developer and holding company were not intended third-party beneficiaries of confidentiality and non-inducement clauses of contract; (2) defendant company could not raise affirmative defense of fraudulent inducement where contract contained no-reliance clauses; (3) defendant company was precluded from enforcing terms of contract due to its anticipatory repudiation of that contract; and (4) trial court did not err in awarding attorney fees pursuant to contract's fee-shifting provision.

¶ 2     This appeal concerns two consolidated breach of contract actions. In case no. 2019 L 11514 (the Boardwalk-Holmer case), plaintiff Stuart Pinkert sued Boardwalk Birch Companies, LLC (Boardwalk) and Arthur Holmer to enforce a note purchase agreement, note, and guaranty. In case no. 2019 L 13730 (the WSE case), plaintiff sued Wells Street Equities, LLC (WSE) to enforce multiple note agreements. Defendants in both actions filed affirmative defenses and counterclaims against plaintiff relating to plaintiff's alleged breach of a contract with WSE (the "Stuart Purchase Agreement"), of which Boardwalk and Holmer claimed to be intended third-party beneficiaries.

¶ 3     The trial court granted summary judgment to plaintiff and against defendants on plaintiff's complaints and defendants' affirmative defenses and counterclaims. For the reasons that follow, we affirm.

¶ 4                 BACKGROUND

¶ 5           The Sheffield Property and the Stuart Purchase Agreement

¶ 6     In 2010, plaintiff's son Adam Pinkert ("Adam") partnered with Holmer to develop a commercial building in Chicago ("Sheffield Property") while soliciting numerous outside investors. Plaintiff contributed "sizable capital" towards the venture. Defendant Boardwalk is a company formed by Holmer to hold membership interests in Sheffield Avenue Investors, LLC ("Sheffield LLC"), which owned and operated the Sheffield Property. Defendant WSE is a company managed by Holmer and the manager of Sheffield LLC.

¶ 7        In 2014, the FBI launched an investigation into Holmer's 2011 refinance of Sheffield LLC's loans. While the investigation was pending, WSE "voluntarily offered to mitigate any damages to Sheffield Avenue and its members of the amounts that WSE concludes may have been used or transferred by WSE from the [2011 transaction] for the benefit of other entities managed by WSE."

¶ 8        Pursuant to this offer, Adam sold his interest in Sheffield LLC to WSE in 2014. Plaintiff followed suit on October 7, 2015, signing the Stuart Purchase Agreement whereby he sold his ownership interest in Sheffield LLC to WSE for $291,193. The agreement contained a confidentiality clause requiring plaintiff to keep the terms of the agreement and information about the Sheffield investment confidential. It further provided that plaintiff "shall not bring against the other Parties any lawsuits, claims or actions on their behalf, or cause any lawsuits, claims or actions to be brought against the other Parties by any other person or entity, except to the extent necessary to enforce the obligations created hereunder." The agreement was secured by a promissory note from WSE to plaintiff (the "WSE Note").

¶ 9        On December 4, 2015, Holmer was charged with federal mortgage fraud in connection with his 2011 refinance of Sheffield LLC's loans. On December 11, Holmer pled guilty pursuant to a plea bargain. Three days prior, on December 8, Holmer met with plaintiff and told him, in regards to the WSE Note, that "he wasn't going to pay. *** He had no money to pay, and he was going to change the terms of the deal." At this point, plaintiff believed that Holmer had "breached the contract, and everything that went before is null and void," including the confidentiality and non-inducement provisions of the Stuart Purchase Agreement.

¶ 10        On December 17, 2015, Adam sent an email to plaintiff and the remaining Sheffield investors in which he stated:

"Collectively, this group represents those that are being impacted the most by Arthur

Holmer's criminal mismanagement of the Sheffield Avenue Investors partnership.

It seems likely that any efforts to wrench control of the asset from the hands of

Holmer would benefit from concerted action among the key investors."

Plaintiff sent a reply in which he discussed possible avenues for ousting Holmer, including

whether Sheffield LLC's operating agreement contained any provision for replacement of the

managing member, and stating: "[I]f we could force a sale of the property that would be the way

to go."

¶ 11       On March 15, 2016, the remaining Sheffield investors (Lakeshore and AFG) filed an

action in the circuit court to remove Holmer as a manager of Sheffield LLC and for damages

resulting from Holmer's alleged breach of fiduciary duties and fraud. *Lakeshore Investments,

LLC v. Holmer*, No. 16-CH-03711 (Cir. Ct. Cook County) (the Lakeshore action). The

Lakeshore action was eventually dismissed with prejudice and is not directly at issue in this

appeal.

¶ 12                                    The Boardwalk-Holmer Case

¶ 13       On January 31, 2017, plaintiff, Boardwalk, and Holmer signed the Sheffield Note

Purchase Agreement, Note, and Guaranty, under which Boardwalk purchased plaintiff's interest

in the WSE Note. In return, Boardwalk agreed to pay plaintiff $150,000 in 24 monthly

installments of $6,250 each, beginning on June 1, 2017 and ending on May 1, 2019. Holmer

guaranteed Boardwalk's obligations under the note. If Boardwalk and Holmer failed to pay and

did not cure within 60 days after notice, the remaining amounts were accelerated. The Note

contained a prevailing-party fee-shifting provision.

¶ 14          On August 23, September 5, and October 4, 2017, Boardwalk made three payments under the Sheffield Note and Guaranty for a total of $18,750. Neither Boardwalk nor Holmer made any further payments. After a "grace period" of nearly two years, plaintiff delivered a formal demand for payment to Boardwalk and Holmer on August 16, 2019.

¶ 15                                      The WSE Case

¶ 16          Plaintiff also had investments in two other companies owned or controlled by Holmer: 230 Huron Street Investors, LLC ("Huron LLC") and LaSalle Investors, LLC ("LaSalle LLC"). On January 1, 2017, Holmer signed two note purchase agreements on behalf of WSE, both relating to plaintiff's prior investments in Huron LLC and LaSalle LLC. In the Huron Note Agreement, WSE agreed to make 48 monthly payments of $10,416.67 each, beginning June 1, 2017 and ending May 1, 2021, to the Stuart L. Pinkert Childrens Trust ("Pinkert Trust"), of which plaintiff is the trustee.  In the LaSalle Note Agreement, WSE agreed to make 48 monthly payments to the Pinkert Trust of $2,083.33 each, beginning June 1, 2017 and ending May 1, 2021. Both agreements contained acceleration clauses in the event of default and clauses entitling plaintiff to recover reasonable attorney fees in any resulting lawsuit.

¶ 17          In 2017, WSE made three payments under the Huron Note Agreement in the total amount of $31,250.00, and three payments under the LaSalle Note Agreement in the total amount of $6,249.99. WSE did not make any further payments. On November 12, 2019, plaintiff delivered to WSE a notice of default under both agreements.

¶ 18                                     Procedural History

¶ 19          On November 17, 2019, plaintiff filed his complaint in the Boardwalk-Holmer case, seeking damages of over $152,000 for Boardwalk and Holmer's breach of the Sheffield Note Purchase Agreement, Note, and Guaranty. On December 13, 2019, plaintiff filed his complaint in

the WSE case, seeking damages of over $840,000 for WSE's breach of the Huron and LaSalle Note Agreements.

¶ 20    Defendants filed affirmative defenses and counterclaims relating to Pinkert's alleged breaches of the confidentiality and non-inducement provisions of the Stuart Purchase Agreement. Specifically, they alleged that in the Stuart Purchase Agreement, plaintiff negotiated a buyout agreement generating a 17% return on his investment, which he disclosed to the other Sheffield investors, causing them "to demand inflated returns on their Sheffield investments." Plaintiff also allegedly "encouraged and induced" the Sheffield investors to file the Lakeshore action in violation of Sheffield LLC's operating agreement, which provided that any dispute between members would be settled by arbitration. Defendants spent "more than $200,000" defending the Lakeshore action before it was dismissed.

¶ 21    Although Boardwalk and Holmer were not parties to the Stuart Purchase Agreement, they argued they were intended third-party beneficiaries of the confidentiality and non-inducement clauses, citing section 4, "Mutual Releases," in which plaintiff

> "holds harmless and forever discharges WSE and Sheffield Avenue and their past, present and future related or affiliated entities, predecessors and successors, their respective present and former directors, officers, partners, principals, members, stockholders, owners, employees, agents[,] servants, subrogees, insurers and attorneys, and their respective representatives, heirs, executors, spouses, personal representatives, administrators, successors, transferees and assigns, and any and all persons natural or corporate in privity with them or acting in concert with them or any of them, from any and all claims *** related to [plaintiff's] investment in Sheffield Avenue, the Sheffield Avenue Property or the Purchased Membership Interests."

Boardwalk and Holmer argued they "fall within the categories of affiliated entities, officers, principals, members, owners, servants and representatives." They further alleged that they would not have entered into the Sheffield Note Purchase Agreement, Note, and Guaranty if they had known plaintiff had breached his obligations under the Stuart Purchase Agreement.

¶ 22　　In consequence, Boardwalk and Holmer argued that they "should be relieved of all further performance under the [Sheffield] Note Purchase Agreement" as well as the Note and Guaranty. They also brought counterclaims for breach of contract, tortious interference with contract (for allegedly inducing Lakeshore and AFG to breach the Sheffield operating agreement by bringing the Lakeshore action), and fraud (in support of which they alleged that plaintiff "knowingly and intentionally failed and refused to disclose" his breach of the Stuart Purchase Agreement when entering into the Sheffield Note Purchase Agreement), seeking damages "expected to be in excess of $200,000."

¶ 23　　Similarly, in its affirmative defenses, WSE alleged that the Huron and LaSalle Note Agreements were invalidated by plaintiff's fraud, insofar as it would not have executed those agreements if it had known that plaintiff breached the Stuart Purchase Agreement. WSE additionally brought counterclaims for breach of contract and tortious interference with contract seeking damages "expected to be in excess of $200,000," representing sums spent defending the Lakeshore action.

¶ 24　　Plaintiff moved for summary judgment in both cases on his breach of contract claims and defendants' affirmative defenses and counterclaims. Plaintiff argued that it was undisputed that defendants made only 3 payments under each note at issue, out of 24 payments required under the Sheffield Note Purchase Agreement and 48 required under the Huron and LaSalle Note Agreements.

¶ 25        Plaintiff argued that defendants' "failure to disclose" allegations were barred by nonreliance clauses in the agreements at issue. Additionally, the undisputed facts showed that defendants "knew [plaintiff] was in contact with AFG and Lakeshore regarding their Sheffield investments long before Defendants signed the 2017 agreements" and "did not actually or justifiably rely on any non-disclosure." In support, he cited emails between himself, Holmer, and Holmer's attorney in 2015 and 2016 referencing his communications with other Sheffield investors.

¶ 26        Plaintiff further argued that defendants could not enforce the Sheffield operating agreement or the Stuart Purchase Agreement because Holmer and WSE first materially breached those agreements. In pleading guilty to federal mortgage fraud in 2015, Holmer, as WSE's manager, admitted to multiple breaches of the Sheffield operating agreement. Additionally, in his December 8, 2015 meeting with plaintiff, Holmer "unequivocally told [plaintiff] that WSE would not pay him under the Stuart Purchase Agreement, or any other agreement [plaintiff] had with Holmer or his companies, and that [plaintiff] should sue him if he didn't like it." Holmer testified in his deposition that he did not recall anything said during the December 8 meeting and therefore could not contradict plaintiff's deposition testimony in that regard. Plaintiff additionally argued that WSE could not enforce the Sheffield operating agreement because on November 1, 2015, it assigned all its Sheffield membership interests and operating rights to Boardwalk. Finally, plaintiff argued that Boardwalk and Holmer were not intended third-party beneficiaries of the Stuart Purchase Agreement.

¶ 27        The trial court granted plaintiff's summary judgment motion and entered summary judgment for plaintiff on his breach of contract claims and on defendants' affirmative defenses and counterclaims in both the Boardwalk-Holmer case and the WSE case. The court found "no

real dispute that the note agreements are valid and enforceable." It further found that Boardwalk and Holmer were not third-party beneficiaries of the Stuart Purchase Agreement and therefore lacked standing to raise affirmative defenses and counterclaims thereon. As to WSE's fraud-based claims, the court found the element of justifiable reliance was negated by the nonreliance clauses in the contracts at issue, and it further found that WSE had actual knowledge of plaintiff's breaches of the Stuart Purchase Agreement prior to execution of the contracts in March 2017. Finally, in regards to WSE's claim for setoff for litigation fees incurred in the Lakeshore action, the court found such fees were unrecoverable due to the American Rule. See *Morris B. Chapman & Associates, Ltd. v. Kitzman*, 193 Ill. 2d 560, 572 (2000) (absent statutory authority or a contractual agreement, each party must bear its own attorney fees and costs).

¶ 28    Pursuant to the fee-shifting provisions in the Sheffield Note Purchase Agreement, the Huron Note Agreement, and the LaSalle Note Agreement, plaintiff filed fee petitions in both the Boardwalk-Holmer case and the WSE case. The trial court granted both petitions (with certain reductions not at issue in this appeal), awarding plaintiff $96,602.02 in fees and costs in the Boardwalk-Holmer case and $82,464.02 in fees and costs in the WSE case. In doing so, the court rejected Boardwalk and Holmer's argument that plaintiff was only entitled to recover fees associated with prosecution of his breach of contract claim and not for fees associated with the affirmative defenses and counterclaims.

¶ 29                                      ANALYSIS

¶ 30    Summary judgment is appropriate where "there is no genuine issue as to any material fact and *** the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2–1005(c) (West 2018). We construe the record strictly against the movant and liberally in favor of the nonmoving parties. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). To prevail, the

nonmoving parties must present some evidence that would arguably entitle them to recover at trial. *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 472 (2010). We review the trial court's grant of summary judgment *de novo* (*Williams*, 228 Ill. 2d at 417) and may affirm on any basis appearing in the record (*Trigsted v. Chicago Transit Authority*, 2013 IL App (1st) 122468, ¶ 50).

¶ 31        In a breach of contract action, plaintiff must plead and prove "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resulting injury to the plaintiff." (Internal quotation marks omitted.) *Burkhart v. Wolf Motors*, 2016 IL App (2d) 151053, ¶ 14. Here, as the trial court found, there is no real dispute that the note agreements in both the Boardwalk-Holmer case and the WSE case are valid and enforceable and that defendants failed to make the required payments. Thus, this case hinges upon defendants' affirmative defenses and counterclaims, which fall into two categories: (1) breach of contract, in regards to plaintiff's alleged breaches of the confidentiality and non-inducement provisions of the Stuart Purchase Agreement, and (2) fraudulent inducement, *i.e.*, that plaintiff "failed and refused to disclose" his breaches of the Stuart Purchase Agreement to induce defendants to enter into the note agreements he now seeks to enforce.

¶ 32                              Plaintiff's Motion to Strike

¶ 33        Initially, plaintiff filed a motion to strike portions of defendants' reply brief, which we have taken with the case. Plaintiff asserts that some of defendants' arguments pertaining to Boardwalk and Holmer's alleged third-party beneficiary status are raised for the first time in their reply brief.

¶ 34        "Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct 1, 2020). "The reply

brief, if any, shall be confined strictly to replying to arguments presented in the brief of the appellee." Ill. S. Ct. R. 341(j) (eff. Oct 1, 2020). Having reviewed the briefs in question, as well as defendants' submissions at the trial court level, we find that defendants previously raised their argument that the Stuart Purchase Agreement should be read as a whole. Moreover, defendants' argument that Boardwalk and Holmer are "affiliates" and "representatives" of WSE is a proper response to the arguments made in plaintiff's brief. However, defendants' new argument that courts may take judicial notice of a party's residence first raised in a motion to reconsider, citing *Zamora v. Lewis*, 2021 IL App (1st) 201296-U, ¶ 32, is forfeited and will not be considered in this appeal.

¶ 35                                    Boardwalk and Holmer's Third-Party Beneficiary Status

¶ 36            Defendants argue that the trial court erred in finding Boardwalk and Holmer were not intended third-party beneficiaries of the Stuart Purchase Agreement and were not entitled to bring affirmative defenses and counterclaims thereon.

¶ 37            Illinois recognizes two types of third-party beneficiaries: an intended beneficiary is intended by the parties to the contract to directly benefit from its performance and may sue to enforce it, while an incidental beneficiary has no rights and may not sue. *Carlson v. Rehabilitation Institute of Chicago*, 2016 IL App (1st) 143853, ¶ 14. "Because parties typically enter into contracts to benefit themselves rather than third parties, there is a presumption against intended beneficiary status that can only be overcome by an implication so strong as to be practically an express declaration." *Doyle v. Tinley Park*, 2018 IL App (1st) 170357, ¶ 33. It is not enough that the parties "know, expect, or intend" that a third party will benefit; the contract "must be undertaken for the third party's direct benefit and the contract must affirmatively make such an intention clear." *Estate of Willis II v. Kiferbaum Construction Corp.*, 357 Ill. App. 3d

1002, 1008 (2005). "It is not necessary that the contract specifically name the third-party beneficiary if it adequately defines a class of individual beneficiaries." *Id.* (citing *Altevogt v. Brinkoetter*, 85 Ill. 2d 44 (1981)).

¶ 38    As a threshold matter, the trial court found that Boardwalk could not be an intended third-party beneficiary of the Stuart Purchase Agreement because it was not yet in existence when the agreement was signed in October 2015. This finding is not supported by the record. On the contrary, the record reflects that Boardwalk, a Delaware corporation, was created in May 2014, although it was not registered to transact business in Illinois until after the signing of the Stuart Purchase Agreement. See *Cox v. Doctor's Associates, Inc.*, 245 Ill. App. 3d 186, 194 (1993) (failure of a foreign corporation to obtain a certificate of authority to transact business in Illinois does not impair the validity of any contract or act of the corporation).

¶ 39    The trial court did not consider defendants' evidence that Boardwalk was created in May 2014 because it was presented for the first time in defendants' motion for reconsideration of summary judgment. See *Liceaga v. Baez*, 2019 IL App (1st) 181170, ¶ 25 (factual argument raised for the first time in a motion for reconsideration is forfeited). However, even disregarding defendants' forfeited evidence, no other competent evidence supported the court's finding that Boardwalk was not in existence at the time the Stuart Purchase Agreement was signed.

¶ 40    Boardwalk and Holmer argue they are intended third-party beneficiaries of section 4(b), "Release by the Seller," in which plaintiff

> "holds harmless and forever discharges WSE and Sheffield Avenue and their past, present and future related or affiliated entities, predecessors and successors, their respective present and former directors, officers, partners, principals, members, stockholders, owners, employees, agents[,] servants, subrogees, insurers and attorneys,

and their respective representatives, heirs, executors, spouses, personal representatives, administrators, successors, transferees and assigns, and any and all persons natural or corporate in privity with them or acting in concert with them or any of them, from any and all claims *** related to [plaintiff's] investment in Sheffield Avenue, the Sheffield Avenue Property or the Purchased Membership Interests."

The record reflects that Holmer was a member of WSE, acting as an agent of WSE and Sheffield LLC, and Boardwalk was a member of Sheffield LLC. See *Estate of Willis*, 357 Ill. App. 3d at 1008 (contract may define a class of beneficiaries); *Polsky v. BDO Seidman*, 293 Ill. App. 3d 414, 422 (1997) (the term "agents" was sufficiently specific to identify a class of third-party beneficiaries to a release agreement).

¶ 41        Plaintiff does not dispute that Boardwalk and Holmer "were released parties under section 4(b)," but argues that they were not intended beneficiaries of the confidentiality provision in section 5 or the non-inducement provision in section 7 of the agreement. In interpreting a contract, our primary objective is to give effect to the parties' intent, considering the contract as a whole. *Gallagher v. Lenart*, 226 Ill. 2d 208, 222-23 (2007). Viewing the Stuart Purchase Agreement as a whole, we do not find that the confidentiality and non-inducement clauses were undertaken for the direct benefit of the released parties under section 4. Although courts routinely hold that a third party identified in a release is entitled to enforce the release itself (see, *e.g.*, *Polsky*, 293 Ill. App. 3d at 422; *American Nat'l Trust Co. of Chicago v. Kentucky Fried Chicken of S. California, Inc.*, 308 Ill. App. 3d 106, 120 (1999); *cf. Perkinson v. Courson*, 2018 IL App (4th) 170364 (applying Missouri law)), defendants do not cite any cases in which a party, solely by virtue of being identified in a release provision, is able to enforce unrelated provisions of the agreement as a third-party beneficiary. Moreover, the language of the confidentiality and

non-inducement clauses does not demonstrate any intent by the parties to directly benefit the released parties. On the contrary, both clauses are specified to apply to "[t]he Parties." Although defendants urge this court to consider the "overlapping purposes and interrelationships" between the release provisions and the confidentiality and non-inducement clauses, we do not find this persuasive, since the "presumption against intended beneficiary status *** can only be overcome by an implication so strong as to be practically an express declaration." *Doyle*, 2018 IL App (1st) 170357, ¶ 33.

¶ 42    We additionally note that, under defendants' interpretation of the contract, the releases in section 4(b), as well as the reciprocal releases by WSE in section 4(a)), would confer blanket intended beneficiary status on all released parties to enforce any and all provisions of the contract. For instance, any "past, present and future" agents, servants, attorneys, heirs, or spouses of plaintiff would have standing in their names to enforce WSE's obligations under the agreement. We decline to adopt such an absurd interpretation of the contract. See *Stonegate Insurance Co. v. Smith*, 2022 IL App (1st) 210931, ¶ 37 (courts construe contracts to avoid absurd results).

¶ 43    Accordingly, Boardwalk and Holmer were not intended third-party beneficiaries of the confidentiality and non-inducement provisions of the Stuart Purchase Agreement and lacked standing to enforce those provisions. Because all of Boardwalk and Holmer's counterclaims and affirmative defenses were based upon the Stuart Purchase Agreement, the trial court correctly granted summary judgment for plaintiff and against Boardwalk and Holmer.

¶ 44                                    No-Reliance Provisions

¶ 45        Defendants next argue that the trial court erred in finding WSE could not prevail on its

fraud-based claims because of the disclaimers of reliance on extracontractual representations in

the Huron and LaSalle Note Agreements.

¶ 46        Fraudulent inducement to enter into a contract is a form of common-law fraud, the

elements of which are "(1) a false statement of material fact; (2) knowledge or belief by the

defendant that the statement was false; (3) an intention to induce the plaintiff to act; (4)

reasonable reliance upon the truth of the statement by the plaintiff; and (5) damage to the

plaintiff resulting from this reliance." *Avon Hardware Co. v. Ace Hardware Corp.*, 2013 IL App

(1st) 130750, ¶ 15. "In determining whether reliance was justifiable, all of the facts which the

plaintiff knew, as well as those facts the plaintiff could have learned through the exercise of

ordinary prudence, are taken into account." (Internal quotation marks omitted.) *Village of

Palatine v. Palatine Associates, LLC*, 2012 IL App (1st) 102707, ¶ 80; see also *Adler v. William

Blair & Co.*, 271 Ill. App. 3d 117, 125-26 (1995) ("A person may not enter into a transaction

with his eyes closed to available information and then charge that he has been deceived by

another" (internal quotation marks omitted)).

¶ 47        "One factor that courts have considered in analyzing justifiable reliance is the presence of

a nonreliance clause in a contract between the parties." *Village of Palatine*, 2012 IL App (1st)

102707, ¶ 80. Here, the Huron and LaSalle Note Agreements contain multiple disclaimers that

the parties are not relying on any extracontractual representations by any other party. In section

6(a), "the Parties mutually represent and warrant that this Agreement is a product of an arms-

length negotiation with both parties to this Agreement being reasonably apprised of all facts that

each deems germane to this Agreement and the Purchase Price." In section 6(b), "[e]ach Party

further represents and warrants that all representations made by any Party as an inducement to

cause any other Party to enter in to this Agreement are contained in this Agreement." Furthermore, in section 6(l), "[e]ach party hereto acknowledges and warrants that they have entered into this Agreement of their own free will and based on their independent business judgment, and without any reliance on any representations or inducements of any other Party *** except as specifically set forth herein."[1]

¶ 48    In *Village of Palatine*, 2012 IL App (1st) 102707, ¶ 80, we held that nonreliance clauses in the subject leases prevented the tenant from establishing justifiable reliance on any alleged statements made by the landlord prior to entering into the leases. The parties "agreed that no promises were made outside of the language of the leases and that [the tenant] was not induced to enter into the leases," thus negating the justifiable reliance element of the tenant's fraud claim. *Id.* ¶ 82. We reached a similar conclusion in *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450, 457 (2004), in which we stated: "Having agreed in writing that they did not rely on any representations found outside the subscription documents, plaintiffs cannot be allowed to argue fraud based on such representations." We found it significant that, as sophisticated businesspeople, plaintiffs could have negotiated for the inclusion of any representations they believed were important. *Id.*; see also *Benson v. Stafford*, 407 Ill. App. 3d 902, 920-28 (2010) (upholding the dismissal of plaintiff's fraud claim due to nonreliance clauses in the parties' contract).

¶ 49    Similarly, in the instant case, WSE represented that it was "reasonably apprised of all facts *** germane to this Agreement" and did not rely on any representations or inducements by plaintiff "except as specifically set forth herein." As in *Tirapelli*, WSE was a sophisticated party

---

[1] Defendants argue that section 6(k), titled "Adequate Information: No Reliance," binds only "Seller," *i.e.*, plaintiff. However, the representations in sections 6(a), (b), and (l), as quoted above, are clearly mutual.

conducting an arms-length business transaction and could have negotiated for the inclusion of any representations it found important. Having disclaimed any reliance on extracontractual representations by plaintiff, WSE cannot now maintain fraud claims premised on justifiable reliance.

¶ 50    Defendants argue that the foregoing cases are inapposite because they involve plaintiffs, rather than defendants, being bound to nonreliance clauses. This is a distinction without a difference. Just like a plaintiff in a fraud action, a defendant raising fraud as an affirmative defense to a breach of contract claim must show that it "reasonably" relied upon a false representation by the other party. *Jordan v. Knafel*, 378 Ill. App. 3d 219, 229 (2007). In light of the nonreliance clauses in the agreements, we find WSE's alleged reliance to be unreasonable as a matter of law. Accordingly, the trial court correctly granted summary judgment to plaintiff on WSE's fraud-based affirmative defenses and counterclaims.

¶ 51                    Anticipatory Repudiation of the Stuart Purchase Agreement

¶ 52    Although the trial court did not explicitly address this in its opinion, we additionally find that WSE's breach of contract claims are precluded by Holmer's anticipatory repudiation of the Stuart Purchase Agreement. See *Trigsted*, 2013 IL App (1st) 122468, ¶ 50 (reviewing court may affirm summary judgment on any basis appearing in the record).

¶ 53    "Unless justified, a definite statement to the promisee that the promisor will not perform its contractual duties constitutes an anticipatory repudiation. [Citation.] Upon repudiation, the promisee may *** elect to treat the repudiation as a breach putting an end to the contract for all purposes of performance." *Wilmette Partners v. Hamel*, 230 Ill. App. 3d 248, 260 (1992). If the party who repudiated the contract subsequently sues the non-repudiating party for failing to perform, the first party's repudiation is a defense. *Tower Investors, LLC v. 111 East Chestnut*

*Consultants, Inc.*, 371 Ill. App. 3d 1019, 1032 (2007). "[A]n anticipatory repudiation continues in effect until affirmatively retracted by the repudiator." *Wilmette Partners*, 230 Ill. App. 3d at 260.

¶ 54    In his deposition, plaintiff testified that on December 8, 2015, Holmer told him that WSE would not pay him under the Stuart Purchase Agreement and that plaintiff "should sue him if he didn't like it." "Facts contained in an affidavit in support of a motion for summary judgment which are not contradicted by counteraffidavit are admitted and must be taken as true." *US Bank, N.A. v. Avdic*, 2014 IL App (1st) 121759, ¶ 31. The record further reflects that after Holmer and WSE repudiated the agreement, plaintiff detrimentally changed his position by communicating with the other Sheffield investors about the terms of the Stuart Purchase Agreement. See *Builder's Concrete Co. of Morton v. Fred Faubel & Sons, Inc.*, 58 Ill. App. 3d 100, 105 (1978) ("Plaintiff stated unequivocally that it would not fulfill its part of the bargain and defendant was justified in taking plaintiff at its word."). Based on its repudiation of the Stuart Purchase Agreement, WSE was not in a position to enforce any provisions of that agreement, and the trial court properly entered summary judgment in favor of plaintiff on WSE's breach of contract affirmative defenses and counterclaims.

¶ 55    As this disposes of all of WSE's remaining claims, we need not consider the parties' arguments regarding WSE's actual or constructive knowledge of plaintiff's breach prior to entering into the Huron and LaSalle Note Agreements, or the application of the American Rule to WSE's setoff claim for fees incurred in the Lakeshore action.

¶ 56                                   Fee-Shifting

¶ 57        Finally, defendants Boardwalk and Holmer argue that the fee-shifting provision of the Sheffield Note Purchase Agreement should not apply to the fees plaintiff incurred to defend against their affirmative defenses and counterclaims.

¶ 58        As previously discussed, under the American Rule, in the absence of statutory authority or a contractual agreement, each party must bear its own attorney fees and costs. *Morris*, 193 Ill. 2d at 572. The Sheffield Note Purchase Agreement provides that "any prevailing party shall be entitled to recover from the non-prevailing parties any and all liability for losses, liabilities, claims, damages, costs, expenses (including costs of investigation and defense and reasonable attorneys' fees) and obligations incurred in any action or proceeding relating to this Agreement." Boardwalk and Holmer nevertheless argue that their affirmative defenses and counterclaims are grounded not in the promissory note and guaranty but in the Stuart Purchase Agreement, which does not contain a fee-shifting provision.

¶ 59        Defendants' claims are without merit. The fees at issue are clearly "costs of *** defense *** in any action or proceeding relating to this Agreement." Notably, the trial court explicitly held that plaintiff "was entitled and required to defend against the affirmative defenses and counterclaims in order to prevail" on his breach of contract claims.

¶ 60        In *Williams v. FDIC*, 155 Ill. App. 3d 633, 639-40 (1987), we upheld the award of the lender's attorney fees on its claim against the borrower for breach of a promissory note, including the lender's fees spent litigating the borrower's affirmative defenses for setoff and estoppel. The note's fee-shifting provision provided that the borrower "is obligated to pay court costs and reasonable attorney fees incurred by the Holder in the collection or enforcement of the debt after default." *Id.* The court thus held that the lender's efforts to defeat the affirmative defenses were "a necessary and integral part of collecting on the promissory note." *Id.* at 640.

Likewise, plaintiff's efforts to defeat Boardwalk and Holmer's affirmative defenses and counterclaims were a necessary and integral part of collecting on the Sheffield Note, and, as such, the trial court correctly awarded plaintiff the fees and costs incurred thereby.

¶ 61                                     CONCLUSION

¶ 62          For the foregoing reasons, we affirm the judgment of the trial court.

¶ 63          Affirmed.